**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-1975
_____

UNITED STATES OF AMERICA

v.

WILLIE TYLER,
                    Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1:96-cr-00106-001)
District Judge: Honorable William W. Caldwell
_____

Argued
May 13, 2013

Before: FUENTES, SHWARTZ, and ROTH, *Circuit Judges*

(Opinion Filed: October 3, 2013)

Ronald A. Krauss, Esq. **[ARGUED]**
Office of Federal Public Defender
100 Chestnut Street

Suite 306
Harrisburg, PA 17101

*Counsel for Appellant Willie Tyler*

Gordon A.D. Zubrod, Esq., Assistant United States Attorney
**[ARGUED]**
Office of United States Attorney
Ronald Reagan Federal Building
228 Walnut Street
P.O. Box 11754
Harrisburg, PA 17108

*Counsel for Appellee United States of America*
_____

OPINION OF THE COURT
_____

FUENTES, *Circuit Judge*:

Willie Tyler was charged under state law for the murder of Doreen Proctor, a witness who was scheduled to testify at his brother's state trial. Tyler was acquitted of the murder charge but convicted of witness intimidation and served a term in state prison. After his release, federal prosecutors brought charges for witness tampering by murder and by intimidation in violation of 18 U.S.C. § 1512. At Tyler's federal trial, the jury was instructed about two legal theories by which the Government could prove its case—tampering with a witness to prevent her testimony at an official proceeding and tampering with a witness to prevent her communication with law enforcement. Tyler was found

guilty and sentenced to life imprisonment, and his conviction was affirmed on appeal. Tyler now argues that two recent Supreme Court decisions, *Arthur Andersen LLP v. United States* and *Fowler v. United States*, limited the scope of the witness tampering statute and have rendered non-criminal the acts for which he was convicted. We conclude that these intervening Supreme Court decisions along with the evidence in the record supports Tyler's actual innocence claim. For this reason, we will remand to the District Court to conduct an evidentiary hearing and provide Tyler an opportunity to present evidence in support of his actual innocence.

## I. BACKGROUND

### A. Factual History

Doreen Proctor's body was found on the side of a country road in Adams County, Pennsylvania on April 21, 1992, shot in the head and chest, badly beaten, and stabbed repeatedly. She had been scheduled to testify that day as a witness against David Tyler, Appellant Willie Tyler's brother, in Pennsylvania state court.[1] In her role as a confidential informant for the Carlisle Police Department, Proctor had made four controlled buys of cocaine from Tyler and from three other individuals, Jerome "Butchie" Evans, Mary Jane Hodge and Cindy Brooks, in early 1991. Proctor had testified against the four individuals at their preliminary hearing, and in January 1992, she testified at Hodge's trial leading to a conviction. After Proctor's death, the remaining trials were halted.

---

[1] We will refer to Willie Tyler as "Tyler" and David Tyler as "David."

Instead, in July 1992, Tyler, along with David and David's girlfriend Roberta Ronique Bell, were charged under state law with criminal homicide and witness intimidation in connection with Proctor's death. Tyler was acquitted of the murder but convicted of witness intimidation, David was convicted of murder, and Bell was acquitted of all charges. Willie Tyler was sentenced to two to four years in state prison.

Federal law enforcement officers began a subsequent investigation into Proctor's death, and in June 1995, Bell was charged with witness tampering and intimidation. After a jury trial, Bell was convicted and sentenced to life imprisonment. *United States v. Bell*, 113 F.3d 1345, 1347 (3d Cir. 1997). In April 1996, after his release from state prison, Tyler was charged by federal authorities with murder and intimidation of a witness in connection with Proctor's death.

The evidence revealed that on April 20, 1992, following a meeting between David and Jerome Evans, David recounted the conversation to Tyler and then stated, "[t]hat bitch is going to die tonight." App. 429. Shortly thereafter, David went to a shed outside of Hodge's house, returned with a sawed-off shotgun and asked Tyler whether he knew how to cock the gun, and Tyler demonstrated that he knew how to do so. That night, Roberta Bell asked a friend to babysit her kids. The next morning, Tyler and David returned to Mary Jane Hodge's home where Tyler said "It's over, she's gone," and David reported, "she's dead, and I'll be at court . . . and that bitch won't." App. 435. That same morning, Bell returned home with an armful of bloody clothes and told her babysitting friend to say she had been home all night. The friend overheard an argument between Tyler, David, and Bell

4

during which Bell told Tyler, "I shot Doreen but you killed her." App. 521.

**B.     Proctor's Involvement with Law Enforcement**

The Tri-County Drug Task Force, a joint anti-drug effort by state and local law enforcement officers from Cumberland, York, and Perry Counties in Pennsylvania was coordinated by Special Agent Ronald Diller of the Pennsylvania Attorney General's Bureau of Narcotics Investigation. In early 1992, at the time of Proctor's death, no federal agent or agency was part of the Task Force. However, a Memorandum of Understanding stated that each Task Force coordinator should evaluate state and local cases to determine which should be referred to the federal Drug Enforcement Administration (DEA). While a Task Force officer was initially responsible for his or her own confidential informants, at the conclusion of an investigation and trial, Special Agent Diller would generally meet with the investigating officers to determine whether there was any potential to expand the investigation. If a case was under consideration for federal involvement, Diller would join the investigating officer in debriefing the informant, and at that point, Diller would decide whether to bring the case to the DEA. Diller estimated that he had brought to the DEA three to five of the Task Force's cases each year for federal prosecution.

Though Diller was neither paid by any federal agency nor authorized to seize drugs or get a search warrant on behalf of the DEA, for certain investigations in the past, he had been deputized to act on the DEA's behalf when he would be traveling outside of Pennsylvania with a federal agent. Diller later testified that he would advise and consult with the DEA

5

but ultimately conceded that he had never previously used the terms "advisor" or "consultant" and instead had borrowed them from an Assistant U.S. Attorney's affidavit.

Doreen Proctor had worked as an informant for Carlisle Police Detective David Fones, an officer with the Tri-County Drug Task Force. At the time of her death, Proctor no longer engaged in undercover operations but had continued to provide Fones with information on the drug market, including local drug activity in Harrisburg and non-local activity about David's drug sources in New York and Jamaica. Diller had also spoken on occasion with Proctor during 1991 and 1992 during Fones's investigation into David and his co-conspirators. While Diller had spoken with Proctor about the local drug activity, at the time of Proctor's death, Diller had not learned about Proctor's non-local information involving the New York and Jamaica drug market. Diller planned, however, to fully debrief Proctor after the conclusion of David's investigation and trial, in accordance with his general practice, and to then decide whether to expand the investigation and involve federal authorities. Diller later testified that had he known about Proctor's knowledge on David's drug connections in New York and Jamaica, the information would have been a significant factor in developing a federal case, and a DEA agent also contended that he would be interested in pursuing a federal case that involved Jamaican and New York drug connections. Nevertheless, at the time of Proctor's death, Diller had neither contacted any federal agency to discuss developing a federal case involving Proctor nor planned to use her as a witness in a federal proceeding. There was also no ongoing state investigations involving Proctor at the time of her death, and while Proctor had agreed to testify at the

6

remaining trials of David and the other defendants, she had previously testified that she would no longer engage in undercover drug operations.

## II.    PROCEDURAL HISTORY

Willie Tyler is no stranger to this Court. After Tyler's state trial in which he was acquitted of murdering a witness and convicted of intimidating a witness, Tyler was federally charged with witness tampering by murder and by intimidation in connection with Proctor's death, in violation of 18 U.S.C. §§ 1512(a)(1)(A) and (C) and 18 U.S.C. §§ 1512(b)(1), (2), and (3), respectively. In August 1996, following a jury trial, Tyler was convicted of witness tampering, and on appeal, we reversed the conviction and granted a new trial based on grounds not relevant here. *United States v. Tyler* (*Tyler I*), 164 F.3d 150, 159 (3d Cir. 1998); *see also United States v. Tyler* (*Tyler II*), 281 F.3d 84, 89 (3d Cir. 2002). Tyler was re-tried, and in August 2000, a jury found Tyler guilty of two counts of tampering with a witness—by murder and by intimidation. He was later sentenced to life imprisonment, and on direct appeal, we affirmed the conviction. *Tyler II*, 281 F.3d at 101.[2]

In December 2009, Tyler filed a *pro se* motion, arguing that *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005), had rendered his conduct non-criminal. The Supreme Court had held in *Arthur Andersen* that certain official proceeding provisions of § 1512's witness

_____

[2] Tyler's conviction has survived several collateral attacks, including a § 2255 motion and other motions construed as successive § 2255 motions. *United States v. Tyler*, 207 F. App'x 173, 177 (3d Cir. 2006).

7

intimidation subsection, § 1512(b)(2)(A) and (B), require that the Government prove a "nexus" between the defendant's conduct and a particular *federal* proceeding. 544 U.S. at 707-08. While his motion was pending, the Supreme Court decided *Fowler v. United States*, 131 S. Ct. 2045, 2952 (2011), holding that an investigation-related communication provision of § 1512's witness murder subsection, § 1512(a)(1)(C), required that there be a reasonable likelihood that a witness's murder was intended to prevent communication with a federal law enforcement officer or judge. Tyler later supplemented his *pro se* motion to address *Fowler*. The District Court construed his motions as a petition for relief under 28 U.S.C. § 2241, which it denied in March 2012. Tyler appealed.

## III.  ANALYSIS[3]

### A.  Availability of Section 2241 Relief

Prior to the enactment of 28 U.S.C. § 2255, federal prisoners could seek post-conviction relief through the writ of habeas corpus, codified under 28 U.S.C. § 2241. Section 2255, however, was enacted as an alternative to the writ of habeas corpus to allow prisoners to seek collateral review in the trial court where the case was prosecuted. *In re*

---

[3] Tyler, who is incarcerated in Lewisburg, Pennsylvania, filed his *pro se* habeas petition in the District Court for the Middle District of Pennsylvania pursuant to 28 U.S.C. § 2241. The District Court dismissed the petition for lack of jurisdiction. We have jurisdiction to review the District Court's dismissal of a § 2241 petition under 28 U.S.C. § 1291.

*Dorsainvil*, 119 F.3d 245, 249 (3d Cir. 1997); *see also United States v. Hayman*, 342 U.S. 205, 213-14 (1952). Section 2255 was later amended to restrict the ability of prisoners to file successive petitions. Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 106, 110 Stat. 1214 (1996).

However, even after § 2255 was enacted, a writ of habeas corpus under § 2241 remained available for prisoners under limited circumstances, including when § 2255 is "inadequate" or "ineffective," 28 U.S.C. § 2255(e), also known as § 2255's "safety valve." We have held that a § 2255 petition is "inadequate" when a petitioner asserts a claim of "actual innocence" on the theory that "he is being detained for conduct that has subsequently been rendered non-criminal by an intervening Supreme Court decision" and our own precedent construing an intervening Supreme Court decision, but is otherwise barred from challenging the legality of the conviction under § 2255. *Dorsainvil*, 119 F.3d at 252. Such a situation "presents exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Id.* at 250 (internal quotation marks omitted). Under those circumstances, we will remand to the district court to consider the record and determine whether the petitioner is actually innocent, that is whether the petitioner's conduct had been rendered non-criminal due to the Supreme Court decision as well as our own precedent construing the Supreme Court's decision. *Id.* at 252. To support an actual innocence claim, the petitioner must "establish that 'in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him.'" *United States v. Garth*, 188 F.3d 99, 107 (3d Cir. 1999) (quoting *Bousley v. United States*, 523 U.S. 614, 623 (1998)). A petitioner can

establish that no reasonable juror would have convicted him by demonstrating an intervening change in law that rendered his conduct non-criminal. *See United States v. Davies*, 394 F.3d 182, 191 (3d Cir. 2005) (citing *Bousley*, 523 U.S. at 620). While *Bousley* addressed the standard that a petitioner must meet for claims brought under § 2255, this standard applies equally to actual innocence claims brought under § 2241. *See, e.g.*, *Stephens v. Herrera*, 464 F.3d 895, 898 (9th Cir. 2006); *Martin v. Perez*, 319 F.3d 799, 804 (6th Cir. 2003).

In the instant action, Tyler contends that he is actually innocent and being detained for conduct that has subsequently been rendered non-criminal due to the Supreme Court's interpretation of 18 U.S.C. § 1512 in *Arthur Andersen* and *Fowler* and by our precedent construing those Supreme Court decisions. If Tyler's contention is correct, "the proper procedure under *Bousley* is to remand to the district court to determine whether a defendant is actually innocent of the charged offense when the record supports such a claim." *Garth*, 188 F.3d at 109. Thus, we must evaluate whether the record supports Tyler's claim of actual innocence and if so whether he is eligible for § 2241 relief.

## B.     The Victim and Witness Protection Act

The Victim and Witness Protection Act of 1982 (VWPA) was enacted to provide protection to witnesses in federal cases. The VWPA contains two key provisions, which follow. The first section addresses witness tampering by murder of a witness:

> Whoever kills or attempts to kill another person, with intent to—

10

(A) prevent the attendance or testimony of any person in an *official proceeding*; . . . or

(C) prevent the *communication by any person to a law enforcement officer* or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished . . . .

18 U.S.C. § 1512(a)(1) (emphasis added). The second section addresses witness tampering through intimidation or threats toward a witness:

Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

(1) influence, delay, or prevent the testimony of any person in an *official proceeding*;

(2) cause or induce any person to—

(A) withhold testimony, or withhold a record, document, or other object, from an *official proceeding*;

(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an *official proceeding*; . . . or

(D) be absent from an *official proceeding* to which such person has been summoned by legal process; or

> (3) hinder, delay, or prevent the *communication to a law enforcement officer* or judge of the United States . . .
> shall be [punished].

*Id.* § 1512(b) (emphasis added). As the text of the law shows, both sections prohibit conduct targeted at official proceedings and at investigation-related communication with law enforcement officers. To constitute an "official proceeding" under § 1512, the proceeding must be before "a judge or court of the United States." *Id.* § 1515(a)(1)(A). A law enforcement officer includes "an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant." *Id.* § 1515(a)(4).

Tyler was convicted of tampering with a witness by murder in violation of an official proceeding provision[4] and an investigation-related communication provision[5] (Count 2). He was also convicted of tampering with a witness by intimidation and threats in violation of two official proceeding provisions[6] and an investigation-related communication provision[7] (Count 3).

---

[4] 18 U.S.C. § 1512(a)(1)(A).
[5] 18 U.S.C. § 1512(a)(1)(C).
[6] 18 U.S.C. § 1512(b)(1) and (b)(2).
[7] 18 U.S.C. § 1512(b)(3).

**C.    Judicial Limitations on Use of Victim and Witness Protection Act**

The Supreme Court addressed certain provisions of § 1512 in *Arthur Andersen* and *Fowler*, and we recently reconciled the Supreme Court's holdings in those two cases in *United States v. Shavers*, 693 F.3d 363 (3d Cir. 2012), *vacated on other grounds by Shavers v. United States*, 133 S. Ct. 2877 (2013).[8] We will review these holdings to determine whether they render Tyler's conduct non-criminal.

1.    Limitations from *Arthur Andersen* and *Fowler*

The Supreme Court's decision in *Arthur Andersen* required that for the government to satisfy the VWPA's witness intimidation section's "official proceeding" requirement, § 1512(b)(2)(A) and (B), it must prove a "nexus" between the defendant's conduct and a foreseeable particular proceeding. *Arthur Andersen*, 544 U.S. at 707-08. Specifically, the government must prove that the defendant sought to interfere with evidence or a witness and acted "in contemplation [of a] particular official proceeding." *Id.* at 708. "[I]f the defendant lacks knowledge that his actions are likely to affect the [official] proceeding," then "he lacks the requisite intent to obstruct." *Id.* (internal quotation marks

---

[8] Our judgment in *Shavers* was subsequently vacated by the Supreme Court in light of *Alleyne v. United States*, 133 S. Ct. 2151 (2013). *Shavers*, 133 S. Ct. at 2877. Because *Alleyne* involves an unrelated sentencing issue, the Supreme Court's vacatur does not affect our holding in *Shavers* with regard to the extension of *Arthur Andersen*'s nexus requirement and *Fowler*'s reasonable likelihood requirement to other provisions in § 1512.

omitted). The "official proceeding" language is also contained in § 1512(a)(1)(A), (b)(1), and (b)(2), the provisions under which Tyler was convicted.

In 2011, the Supreme Court in *Fowler* analyzed the investigation-related communication provision in the VWPA's witness murder section, § 1512(a)(1)(C), which requires that the murder of a witness is intended to "prevent the communication by any person to a law enforcement officer." The Court held that "in a case . . . where the defendant does not have particular federal law enforcement officers in mind[] the Government must show *a reasonable likelihood* that, had . . . the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." *Fowler*, 131 S. Ct. at 2052. The Supreme Court noted that the "reasonable likelihood" standard was necessary to prevent "transform[ation of] a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature." *Id.* The Court emphasized that the Government must show more than "a mere possibility that a communication would have been with federal officials" and "that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* at 2051-52.

### 2. Reconciling These Limitations in *Shavers*

In *United States v. Shavers*, which we decided after the District Court's denial of Tyler's § 2241 petition, we reconciled the Supreme Court's holdings in *Arthur Andersen* and *Fowler*. 693 F.3d at 378-79. While the *Arthur Andersen* Court only specifically addressed the nexus requirement in

14

the official proceeding provisions of § 1512(b)(2)(A) and (B), we held that the analysis applies "with equal force to § 1512(b)(1)," which also was qualified by an official proceeding. *Id.* at 378. Reasoning that "[c]onsistency demand[ed] that we apply the *Arthur Andersen* nexus requirement to § 1512(b)(1)," we held that the Government was required to "prov[e] that the defendant contemplated a particular 'official proceeding' that was foreseeable when he or she engaged in the proscribed conduct." *Id.* While we did not address the other provisions in § 1512 that were also qualified by an official proceeding, based on our view of what "consistency demands," we implied that *Arthur Andersen*'s nexus requirement would apply to all § 1512 provisions proscribing conduct intended to affect an official proceeding.

We also considered *Fowler*'s "reasonable likelihood" requirement for the investigation-related communication provision and rejected the view that it would apply to an official proceeding provision, § 1512(b)(1). We concluded that for the same reasons that *Arthur Andersen*'s nexus requirement does not apply to the investigation-related communication provisions, it would be "illogical" to apply *Fowler*'s reasonable likelihood requirement in the context of prosecutions under the official proceeding provisions. *Id.* at 379. Instead, we recognized that each of the § 1512 categories was subject to a different set of requirements, concluding that "there are at least two lines of jurisprudence developing separately under the VWPA: one for the investigation-related provisions, such as § 1512(b)(3) and (a)(1)(C), and one for the 'official proceeding' provisions, such as § 1512(b)(1) and (b)(2)." *Id.*

15

## D. Effect of Intervening Supreme Court Decisions on Tyler's Convictions

### 1. Official Proceeding: Nexus Requirement

Tyler contends that his conduct has been rendered non-criminal by the Supreme Court's decision in *Arthur Andersen* because there was no evidence from which the Government could establish a nexus with an official proceeding. The District Court, though, held that *Arthur Andersen* did not establish that Tyler was actually innocent of his witness tampering offenses. It recognized that other Circuits have held that *Arthur Andersen*'s nexus requirement applies to other VWPA provisions containing the official proceedings language. *United States v. Tyler*, No. 1:96-CR-106, 2012 WL 951479, at *9 (M.D. Pa. Mar. 20, 2012) (citing *United States v. Phillips*, 583 F.3d 1261, 1263-64 (10th Cir. 2009) and *United States v. Matthews*, 505 F.3d 698, 707-08 (7th Cir. 2007)). However, it reasoned that because the conduct at issue in *Arthur Andersen* was "by itself not inherently wrong," a nexus requirement was necessary to ensure that "innocent conduct is not punished," whereas Tyler's conduct involved "consciousness of wrongdoing" so no such nexus requirement was necessary. *Id.*, at *9-10. Thus, it disagreed with the holdings of these Circuits and held that *Arthur Andersen*'s nexus requirement does not apply to § 1512(a)(1)(A) and (C) and § 1512(b)(1) and (b)(3), because "*Arthur Andersen* has not altered the legal landscape for all section 1512 offenses." *Id.*, at *10.

The District Court's holding is in sharp contrast with our subsequent holding in *Shavers*. There we expressly held that the nexus requirement for official proceedings extends to § 1512(b)(1) and implied that the nexus requirement would

16

apply likewise to other obstructive conduct involving an official proceeding proscribed by § 1512. We similarly conclude here that in any prosecution brought under a § 1512 provision charging obstruction of justice involving an "official proceeding," the government is required to prove a nexus between the defendant's conduct and a particular official proceeding before a judge or court of the United States that the defendant contemplated. *Arthur Andersen*, 544 U.S. at 708. This holding is in line with our sister Circuits that have all concluded that the nexus requirement applies to other § 1512 provisions qualified by an official proceeding. *See United States v. Bennett*, 664 F.3d 997, 1013 (5th Cir. 2011) (applying nexus requirement to § 1512(c)(2)), *vacated on other grounds by* 133 S. Ct. 71 (2012); *United States v. Friske*, 640 F.3d 1288, 1292 (11th Cir. 2011) (same); *Phillips*, 583 F.3d at 1263-64 (same); *United States v. Carson,* 560 F.3d 566, 584 (6th Cir. 2009) (same); *Matthews*, 505 F.3d at 707-08 (applying nexus requirement to § 1512(c)(1)); *United States v. Kaplan*, 490 F.3d 110, 126 (2d Cir. 2007) (applying nexus requirement to § 1512(b)(1)).

Having considered the effect of *Arthur Andersen* on the § 1512 official proceeding provisions, we now must examine whether the evidence in the record is consistent with Tyler's claim that he is actually innocent of violating § 1512's official proceeding provisions. We emphasize that our review "does not amount to a determination of whether there is sufficient evidence to convict," but only considers whether the evidence supports Tyler's actual innocence claim "such that remand is required to allow [him] an opportunity to establish his actual innocence." *Garth*, 188 F.3d at 110. We believe that it does.

In *Shavers*, we considered the evidence presented at trial and concluded that it was insufficient as a matter of law to satisfy the official proceedings requirement because the defendant's conduct was directed at preventing a witness from testifying in a state court proceeding and because there was no evidence that the defendant contemplated another proceeding. 693 F.3d at 379-80. Tyler's case is no different. Similar to *Shavers*, there was no evidence that Tyler's conduct was directed at preventing Proctor's testimony at anything other than as a witness to a state drug offense at Tyler's brother's state trial, or that Tyler contemplated a federal proceeding. Special Agent Diller conceded at Tyler's trial that at the time of Proctor's death he had not contacted any federal agency to discuss a federal case involving Proctor as a federal witness and there was no plan to use her in a federal proceeding. Indeed, in considering the appeal of Tyler's co-conspirator, we concluded that "there was no federal proceeding contemplated at the time of Proctor's murder." *Bell*, 113 F.3d at 1348.[9] Thus, based on our review

---

[9] We also concluded that Diller's testimony could not "be construed to mean that the Task Force had already decided at the time of Proctor's murder to make a federal case out of the drug trade in which Tyler, Bell, and others were engaged, or that it had even thought about doing so." *United States v. Bell*, 113 F.3d at 1348 n.2. Nevertheless, we upheld Bell's conviction based on our then-existing interpretation of 18 U.S.C. § 1512. We found that "while the evidence may lend itself more obviously to the theory that Bell killed Proctor in order to prevent her from testifying a few hours later at [David] Tyler's trial, it also supports the inference that Bell believed Proctor was going to continue to communicate with the Task Force concerning drug crimes that Bell and

of the record, we have uncovered no evidence to satisfy *Arthur Andersen*'s requirement that the Government prove a nexus between Tyler's conduct and a foreseeable particular federal proceeding to establish a conviction under § 1512(a)(1)(A), (b)(1), and (b)(2). For this reason, we conclude that there is not enough in the record to negate Tyler's claim that he is actually innocent of tampering with a witness involved in an official proceeding. Accordingly, the District Court has jurisdiction to consider Tyler's § 2241 petition and provide him with an opportunity to establish his actual innocence under the official proceeding provisions.

2. <u>Investigation-Related Communications: Reasonable Likelihood Test</u>

Tyler also argues that *Fowler* has rendered his conduct non-criminal under § 1512's investigation-related communication provisions because the Government failed to establish that there was a reasonable likelihood that Proctor would communicate with federal law enforcement officers. The District Court, however, held that *Fowler* did not aid Tyler in establishing his actual innocence. Because we had affirmed Tyler's conviction based on the sufficiency of the evidence, the District Court presumed that the evidence must

---

others had committed." *Id.* at 1350. In Tyler's direct appeal, we relied on our holding in *Bell* for the view that § 1512 "does not require that the defendant know or intend anything with respect to this federal character," *Tyler II*, 281 F.3d at 92 (quoting *Bell*, 113 F.3d at 1348), an interpretation that is no longer correct under *Arthur Andersen*. As a result, we upheld Tyler's conviction, reasoning that "the evidence presented at trial demonstrated Tyler knew Doreen Proctor would be testifying against his brother in a federal prosecution." *Id.*

19

also have satisfied *Fowler*'s "reasonable likelihood" test. *Tyler*, 2012 WL 951479, at \*12. However, the District Court did not consider that our affirmance incorporated our pre-*Fowler* interpretation of § 1512 that a conviction may be based on "proof that the officers with whom [Tyler] believed [Proctor] *might* communicate would in fact be federal officers." *Tyler II*, 281 F.3d at 100 (emphasis added) (internal quotation marks omitted), and not whether a reasonable jury could find that the evidence established a *reasonable likelihood* that Proctor would communicate with federal officers.

Our pre-*Fowler* interpretation of § 1512 comes from *United States v. Stansfield*, where we held that the investigation-related communication provision of the witness murder section, § 1512(a)(1)(C), only required proof that "the defendant believed that the [witness] might communicate with the *federal* authorities." 101 F.3d 909, 918 (3d Cir. 1996). We also permitted the jury to infer this element "from the fact that the offense was federal in nature, plus additional appropriate evidence." *Id.* We found our framework an appropriate balance between the requirement that the government must prove the "defendant's specific intent to hinder a *federal* investigation" without imposing an unnecessary hurdle by proving "the defendant knew the federal status of any particular law enforcement officer involved in an investigation." *Id.* at 919. But *Fowler* reached a different balance, requiring instead that the jury find that if Tyler did not have a particular federal law enforcement officer in mind, then the Government must establish "a reasonable likelihood" that had Proctor "communicated with law enforcement officers, at least one relevant

20

communication would have been made to a federal law enforcement officer." 131 S. Ct. at 2052 (emphasis omitted).

*Fowler* thus calls into question *Stansfield*'s requirement that the government only prove that the defendant believe the witness "might" communicate with federal law enforcement. First, our use of the term "might" permitted a mere possibility rather than a reasonable likelihood, which fails to comport with the Supreme Court's admonition that a reasonable likelihood requires more than "a mere possibility" or "that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Fowler*, 131 S. Ct. at 2051-52. Worse, that we permitted an inference of the element further violated *Fowler* by "transform[ing] a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature." *Fowler*, 131 S. Ct. at 2052. In light of this, it is necessary for us to revise the elements for a § 1512 investigation-related communication offense.

In *Stansfield*, we held that to establish a conviction under the investigation-related communication provision of the witness murder section of the VWPA, the government must prove:

> (1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) that offense was actually a federal offense; and (4) the defendant believed that the person in (2) above might communicate with the *federal* authorities.

21

101 F.3d at 918. We now hold that in addition to the first three *Stansfield* elements as applied to the murder or intimidation of a witness, the government must establish a *reasonable likelihood* that the person whom the defendant believes may communicate with law enforcement *would* in fact make a relevant communication with a federal law enforcement officer.[10] To establish this reasonable likelihood, "there must be evidence—not merely argument" of the witness's cooperation with law enforcement, *United States v. Lopez*, 372 F.3d 86, 92 (2d Cir. 2004) (emphasis omitted), *vacated on other grounds by* 125 S. Ct. 1613. Nevertheless, just as *Fowler* specifically noted that § 1512 reaches conduct that occurs before the victim had any communications with law enforcement officers, 131 S. Ct. at 2049, here, too, we emphasize that "the government need not prove that a federal investigation was in progress at the time the defendant committed [a] witness-tampering" offense. *United States v. Ramos-Cruz*, 667 F.3d 487, 498 (4th Cir. 2012).

Having concluded that the intervening change in law again supports Tyler's claim of actual innocence of violating the investigation-related communication provisions, we will consider the evidence that the Government presented to satisfy the reasonable likelihood test. If the Government failed to establish a reasonable likelihood that at least one of Proctor's communications with law enforcement would have

---

[10] Although this panel lacks the authority to overrule precedential opinions from a prior panel, we may reevaluate our precedent in light of an intervening Supreme Court decision. *Inst. Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 n.50 (3d Cir. 2009).

been with a federal law enforcement officer, then we must remand to the District Court. *See Fowler*, 131 S. Ct. at 2053 (noting that it would "leave . . . to the lower courts to determine whether, and how, the [reasonable likelihood] standard applies"). In this case, the Government introduced evidence that Proctor had communicated with Pennsylvania Special Agent Diller, that Diller would advise and consult with the DEA, and that he planned to fully debrief Proctor after David Tyler's trial concluded to determine whether to expand the investigation. Yet, in violation of *Fowler* and based on our prior erroneous interpretation of § 1512, the jury was only required to find "that the officers with whom [Tyler] believed [Proctor] *might* communicate would be in fact federal officers." App. 687 (emphasis added). Having reviewed the record as it now stands, we conclude that there is enough evidence to support Tyler's claim that he is actually innocent of violating § 1512's investigation-related communication provisions.

## E.     Procedure on Remand

Having concluded that the record supports Tyler's claim of actual innocence on both the official proceedings legal theory and the investigation-related communication legal theory, we hold that the District Court erred in concluding that it lacked jurisdiction to consider Tyler's § 2241 petition rather than providing him with an opportunity to demonstrate his actual innocence. *See Garth*, 188 F.3d at 109, 114; *see also Dorsainvil*, 119 F.3d at 252 (remanding to district court after concluding that petitioner's § 2241 claim "is not so devoid of merit that it should be foreclosed by us at this stage"). On remand, the District Court shall conduct an evidentiary hearing, in accordance with *Bousley*, to allow Tyler to prove his claim of actual innocence. Tyler is free to

23

"rest on the record as it now stands," and the Government may present additional admissible evidence to refute Tyler's actual innocence claim. *Garth*, 188 F.3d at 110 n.13, 114.

If the District Court concludes that Tyler has met his burden of establishing his actual innocence as to both theories, then it must issue the writ of habeas corpus and vacate Tyler's convictions, pursuant to § 2241. If, however, the District Court concludes that Tyler has met his burden of establishing his actual innocence based on either the official proceeding provisions or the investigation-related communication provisions, but not both, then it must fashion a remedy in light of the general verdict reached in this case. The jury was instructed that the Government could prove its case on each of the witness tampering counts based on either of two legal theories: (1) tampering to prevent the person's testimony in an official proceeding; or (2) tampering to prevent the person's communication to a law enforcement officer. Because the jury returned a general verdict on both counts, we are unable to determine the legal theory on which it based its verdict.

Generally, when a jury returns a general verdict and the evidence is insufficient to support a conviction on one legal theory but sufficient to convict on another theory, then the reviewing court should let the verdict stand, assuming that the jury convicted on the factually sufficient theory. *United States v. Syme*, 276 F.3d 131, 144 (3d Cir. 2002) (citing *Griffin v. United States,* 502 U.S. 46, 49-50 (1991)). However, when "one of two or more alternative theories supporting a count of conviction is either (1) unconstitutional, or (2) legally invalid, then the reviewing court should vacate the jury verdict and remand for a new trial without the invalid or unconstitutional theory." *Id.* (citing *Griffin*, 502 U.S. at

56). This is because "a jury is presumed to be able to distinguish factually sufficient evidence from factually insufficient evidence," but "is not presumed, however, to be able to distinguish accurate statements of law from inaccurate statements." *Id.* (citing *Griffin*, 502 U.S. at 59). A legal theory is invalid when, as here, "the indictment or the district court's jury instructions are based on an erroneous interpretation of law or contain a mistaken description of the law." *Id.* at 145. Thus, if the District Court concludes that Tyler has failed to establish his actual innocence based on one but not both legal theories, then it may not let the verdict stand, and instead it must order a new trial based only on the legally valid theory.

## IV.  CONCLUSION

In light of the foregoing, we remand for further proceedings consistent with this opinion.

SHWARTZ, <u>Circuit Judge</u>, dissenting:

The Majority and I agree that if Willie Tyler can meet the "actual innocence" standard to invoke § 2255's "safety valve," then he would be permitted to file a petition under § 2241. Maj. Typescript at 8-9. I depart from the Majority, however, because I understand the actual innocence standard to require us to consider whether a reasonable, properly instructed juror would have convicted Tyler and applying this standard to the present record supports a conclusion that Tyler has not met the actual innocence standard and that the order of the District Court should be affirmed. Further, unlike my colleagues, I conclude that the general verdict in this case does not impact our ability on habeas review to evaluate whether a reasonable, properly instructed juror would have convicted Tyler.

I.

Under <u>Bousley v. United States</u>, 523 U.S. 614 (1998), and <u>Schlup v. Delo</u>, 513 U.S. 298 (1995), to demonstrate "actual innocence," a habeas petitioner must show that, in light of all the evidence, it is more likely than not that no reasonable, properly instructed juror would have convicted him.[1] <u>Bousley</u>, 523 U.S. at 623; <u>Schlup</u>, 513 U.S. at 327-29.

---

[1] This strict standard is appropriate. The actual innocence standard seeks to "balance the societal interests in finality . . . and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case." <u>Schlup</u>, 513 U.S. at 324. To reflect this balance, the actual innocence standard is therefore purposefully "demanding" and was formulated to ensure that

1

Tyler was convicted of violating the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 1512, which makes it unlawful to, among other things, tamper with a person, by murder or intimidation, with the intent to prevent that person from participating in an "official proceeding" or to tamper with a person, by murder or intimidation, with the intent to prevent that person from communicating with a "law enforcement officer."[2]  As the Majority notes, after Tyler's trial, the Supreme Court clarified the VWPA's federal nexus requirement under both the official proceeding provisions and the law enforcement investigation-related provisions in Arthur Andersen LLP v. United States, 544 U.S. 696 (2005), and Fowler v. United States, 131 S. Ct. 2045 (2011), respectively.  Maj. Typescript at 10-14.  Because the jury was instructed before these cases were decided, the District Court's instructions were based on an interpretation of the VWPA that, though correct at the time, was ultimately

---

a successful petitioner's case is "truly extraordinary."  House v. Bell, 547 U.S. 518, 537-38 (2006) (quotation marks and citations omitted); see also McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013) (noting that a showing of actual innocence may "serve[] as a gateway" through an "impediment" that otherwise bars consideration of a petitioner's claim).

[2] Because § 1512 is written in the disjunctive, the official proceeding provisions and the law enforcement investigation-related provisions are alternative ways of committing the same offense.  18 U.S.C. § 1512; see also United States v. Rigas, 605 F.3d 194, 208 (3d Cir. 2010) (en banc) (noting that Congress's "use of disjunctive language creates alternative ways of violating a statute" and that such language "created a single offense that may be committed in alternative ways").

rendered erroneous. Accordingly, the jury was instructed under theories that are now "legally invalid." See United States v. Syme, 276 F.3d 131, 145 (3d Cir. 2002) (noting that a legal theory is invalid where "the indictment or the district court's jury instructions are based on an erroneous interpretation of law or contain a mistaken description of the law."). As I understand the Supreme Court's cases on actual innocence, however, that is just the beginning of our inquiry. To apply the actual innocence standard, we must also identify the proper instructions for the crime charged and evaluate the record in light of these instructions to determine if a reasonable, properly instructed juror would have convicted Tyler.[3]

Because "'[a]ctual innocence' means factual innocence, not mere legal insufficiency," a showing that the jury was instructed on a legally invalid theory alone does not satisfy the actual innocence standard. Bousley, 523 U.S. at

---

[3] The Majority cites United States v. Davies, 394 F.3d 182, 191 (3d Cir. 2005), for the proposition that "[a] petitioner can establish that no reasonable juror would have convicted him by demonstrating an intervening change in law that rendered his conduct noncriminal," Maj. Typescript at 10. While this is a correct statement, I part company with the Majority as its analysis does not include consideration of whether the change in the law here, as applied to the facts of our case, demonstrates that no reasonable juror could find that Tyler did not violate the law. A court analyzing a petitioner's actual innocence claim must apply the holding of the intervening Supreme Court decision to the record to determine if a reasonable juror applying such law would have convicted him. See id. at 192-96.

3

623. <u>Bousley</u> and <u>Schlup</u> require the Court to ask what a reasonable, properly instructed juror *"would do"* when considering the evidence presented. <u>Schlup</u>, 513 U.S. at 329 (emphasis added); <u>see also</u> <u>Bousley</u>, 523 U.S. at 623. Unlike the direct appeal cases on which the Majority relies, <u>Bousley</u> and <u>Schlup</u> require us to ignore what the improperly instructed jury at Tyler's trial *actually did* and direct that we examine the record under the current law. As a result, legally invalid jury instructions given at trial alone cannot render a petitioner actually innocent because <u>Bousley</u> and <u>Schlup</u> require us to review the facts from the perspective of a reasonable, properly instructed juror.[4]

---

[4] Several of our sister circuits have held similarly. <u>See, e.g.</u>, <u>Ryan v. United States</u>, 645 F.3d 913, 917 (7th Cir. 2011) ("[The actual innocence] standard depends on the content of the trial record, not the content of the jury instructions.") <u>vacated on other grounds by</u> <u>Ryan v. United States</u>, 132 S. Ct. 2099 (2012); <u>Stephens v. Herrera</u>, 464 F.3d 895, 899 (9th Cir. 2006) ("[T]he mere fact of an improper instruction is not sufficient to meet the test for actual innocence."); <u>Bosley v. Cain</u>, 409 F.3d 657, 662 (5th Cir. 2005) ("[T]he [actual innocence] standard requires the district court to 'make a probabilistic determination about what reasonable, properly instructed jurors would do.'") (quoting <u>Schlup</u>, 513 U.S. at 329).

Moreover, at oral argument, both Tyler and the Government acknowledged this very point. Oral Arg. at 8:04-8:20 ("At this point in the litigation . . . I don't think jury instructions are something I can attack. It's really a matter of establishing a lack of criminal conduct at this point.") (May 13, 2013); Oral Arg. at 32:23-32:34 ("When we come to

In Schlup, the Supreme Court set forth certain attributes of such a reasonable juror. First, such a "reasonable juror would consider fairly all of the evidence presented." Schlup, 513 U.S. at 329. Second, "such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." Id. Finally, and most importantly here, courts must presume that such a juror has been "properly instructed." Id. A "properly instructed" juror is a juror who has been given "completely accurate" instructions. See Goldblum v. Klem, 510 F.3d 204, 240 (3d Cir. 2007); Davies, 394 F.3d at 196 (reviewing an actual innocence claim and considering the perspective of a properly instructed juror). Accordingly, if an instruction was erroneous when it was given, a court evaluating a claim of actual innocence must determine whether a correct instruction, in light of the record, "would change the jurors' minds as to . . . guilt." Goldblum, 510 F.3d at 235.

## II.

Under this standard, the analysis is straightforward. As the Majority correctly points out, Arthur Andersen and Fowler clarified the federal nexus requirement under both the official proceeding provisions and the law enforcement investigation-related provisions. Maj. Typescript at 10-14. Thus, under Bousley and Schlup, we must apply the law as it currently stands to the record and determine whether "it is more likely than not that no reasonable juror would have convicted [Tyler]." Bousley, 523 U.S. at 623 (quotation marks and citations omitted); see also Ryan, 645 F.3d at 918

actual innocence . . . the Court is not to consider jury instructions or anything else. It is actual innocence.") (May 13, 2013).

5

(noting that <u>Bousley</u> requires a court to ask "whether, applying current legal standards to the trial record, [a petitioner] is entitled to a judgment of acquittal.").

To convict on the official proceeding provisions after <u>Arthur Andersen</u>, the Government must "prov[e] that the defendant contemplated a particular 'official proceeding' that was foreseeable when he or she engaged in the proscribed conduct." <u>United States v. Shavers</u>, 693 F.3d 363, 378 (3d Cir. 2012). Here, I agree with the Majority, and every court that has reviewed the facts surrounding Proctor's murder, that there is a total absence of proof of an "official proceeding," as defined by the statute, of any kind, whether particular, foreseeable, or otherwise. Maj. Typescript at 16-19; <u>see also</u> <u>United States v. Bell</u>, 113 F.3d 1345, 1348 (3d Cir. 1997) (noting, on the appeal of Tyler's co-defendant, that "there was no federal proceeding contemplated at the time of Proctor's murder"); <u>United States v. Tyler</u>, Crim. No. 96-106, 2012 WL 951479, at *5 (M.D. Pa. Mar. 20, 2012) ("There was no evidence presented to show that a federal proceeding had been instituted, about to be instituted, or even contemplated at the time that Proctor was murdered."). As a result, under the law both before and after <u>Arthur Andersen</u>, a reasonable juror could not find that Tyler engaged in tampering activity with the intent to interfere with an official proceeding as defined under the VWPA.[5]

---

[5] While the Majority ostensibly remands to the District Court to conduct an evidentiary hearing, the directions the District Court must follow, Maj. Typescript at 23-25, will almost certainly result in a new trial for Tyler. This is because the Majority instructs the District Court to vacate the jury's verdict if Tyler can establish his actual innocence on

This is not the case, however, for the law enforcement investigation-related provisions. To convict a defendant under these provisions, the Government must prove that the defendant tampered with a witness to interfere with a communication from that witness to a law enforcement officer, 18 U.S.C. § 1512(a)(1)(C) and (b)(3), and that there was "a *reasonable likelihood* that, had . . . the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." Fowler, 131 S. Ct. at 2052 (emphasis in original). A "law enforcement officer" is an "officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant . . . authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense . . . ." 18 U.S.C. § 1515(a)(4)(A). The Government need not prove that the defendant knew that the law enforcement officer was federal or acting as an advisor or consultant to the federal government. 18 U.S.C. § 1512(g)(2).

The record shows that a reasonable juror could have found that it was publicly known that Proctor had been cooperating with law enforcement and that it was reasonably likely, based upon the type of information she had and with

---

just one of the two theories. Maj. Typescript at 25. The Majority has found that there is "no evidence" of an official proceeding. Maj. Typescript at 18. Thus, unless the Government can produce new evidence of an official proceeding on remand, the Majority's instructions to the District Court would likely require vacatur on this ground.

7

whom she was speaking, that Proctor would have communicated with federal officers. According to the trial record, Proctor was an informant for the Tri-County Drug Task Force (the "Task Force"), which was comprised of state and local law enforcement officers. Richard Diller, an agent with the Pennsylvania Office of Attorney General, Bureau of Narcotics Investigation, was the Task Force coordinator. Diller worked closely with, and referred cases to, federal agencies, including the Drug Enforcement Administration ("DEA"). Diller regularly advised and consulted with the DEA, determined whether a case should be brought to federal law enforcement, and, although not formally deputized, was authorized to develop cases on behalf of the DEA.

When Proctor was murdered, she was an informant for David Fones, a local narcotics detective who worked with the Task Force. Sometime before her murder, Proctor provided Fones with information concerning David Tyler's source for cocaine in New York City and his ties to Jamaican drug distributors. According to Fones, the Task Force protocol required Diller to evaluate information Proctor provided to determine if it could be used in other investigations, and, to this end, Fones testified that he would have met with Diller to discuss a further role for Proctor. Although Diller was not aware of Proctor's statements to Fones before her death, Diller testified that Proctor's statements to Fones would have been significant in deciding whether Proctor would have been a federal witness, and that he intended to refer Proctor to the DEA as a witness. DEA Special Agent Keith Humphreys testified that, had he been provided with Proctor's statements to Fones, the DEA would have been interested in pursuing this information and Proctor would have likely been a DEA witness. Based on this record, and as this Court has already

8

concluded, United States v. Tyler, 281 F.3d 84, 99 (3d Cir. 2002), a reasonable juror could find that Diller was a federal "law enforcement officer" for purposes of the VWPA, who advised and consulted with the DEA on a regular basis, frequently referred cases from the Task Force to federal law enforcement agencies, including the DEA, was the intended recipient of drug trafficking information from Proctor concerning multistate and multinational drug dealers, and intended to refer Proctor to the DEA. Accordingly, a reasonable juror, properly instructed in accordance with Fowler, could find that Proctor would have communicated with law enforcement about drug trafficking and that there was a reasonable likelihood that one of these communications would have been made to a federal law enforcement officer. Because the record belies Tyler's claim of actual innocence, I would affirm the District Court's order dismissing Tyler's petition for lack of jurisdiction.

## III.

The fact that the jury returned a general verdict does not impact our ability to evaluate Tyler's actual innocence claim. First, the general verdict precedents upon which the Majority relies, Griffin v. United States, 502 U.S. 46 (1991), and Syme, 276 F.3d 131, are direct appeal cases that apply a different and less demanding standard. As direct appeal cases, Griffin and Syme focus on the actions of the jury. Under the "actual innocence" standard applicable at this stage, Bousley and Schlup mandate that the focus be on proof of Tyler's actual innocence and not the actions of the jury. Applying the perspective set forth under Griffin and Syme both ignores the actual innocence standard and effectively lessens the burden Tyler must carry to invoke § 2255(e)'s

9

safety valve,[6] upsetting the balance the Supreme Court carefully struck when it formulated the demanding actual innocence standard.

Second, even assuming Griffin and Syme apply, they do not require a different result. Griffin states that if the record shows that there is sufficient evidence to support one theory but insufficient evidence to support another, then the jury is presumed to have convicted on the theory that the evidence supports. Griffin, 502 U.S. at 59-60. Here, there was no evidence of an official proceeding and thus a reasonable juror's verdict would not have been based upon this theory. This leaves one other basis, the law enforcement investigation-related provisions, for a reasonable juror to have returned a guilty verdict. While the verdict was based on an improper jury instruction, the actual innocence standard requires that we examine the record in light of a proper instruction.[7] As set forth above, there is sufficient evidence

---

[6] Further, the Majority's application of Griffin and Syme here appears even more relaxed than it would be on direct appeal. Indeed, in general verdict cases on direct appeal, even if a jury was instructed on a legally invalid theory, the verdict need not be vacated if the instructional error was harmless. See Skilling v. United States, 130 S. Ct. 2896, 2934 (2010).

[7] It is true that Syme holds that when "one of two or more alternative theories supporting a count of conviction is . . . legally invalid, then the reviewing court should vacate the jury verdict and remand for a new trial without the invalid or unconstitutional theory," Syme, 276 F.3d at 144 (citation omitted), but the delivery of erroneous jury instructions alone

10

from which such a reasonable, properly instructed juror could have returned a guilty verdict. Because Tyler cannot demonstrate that he is actually innocent on *both* theories of guilt,[8] he cannot satisfy the actual innocence test and thus, I would conclude that the District Court properly dismissed his petition.

For these reasons, I respectfully dissent.

---

does not satisfy the actual innocence standard. See infra at 3-4.

[8] Our decision in United States v. Garth, 188 F.3d 99 (3d Cir. 1999), supports this conclusion. In Garth, the habeas petitioner had pled guilty to an offense under 18 U.S.C. § 924(c), which could be violated in one of four alternative ways. Id. at 110. After his conviction, the Supreme Court narrowed § 924(c) and the petitioner sought relief under § 2255, invoking the actual innocence exception to the procedural default bar. Id. at 103-05, 107-09. The Garth majority found that the record supported the petitioner's actual innocence claim only after reviewing the evidence on each of the four possible theories. Id. at 109-114. Thus, the Garth majority recognized that, in order for a petitioner to be actually innocent of a criminal statute with alternative means of committing an offense, such a petitioner must be actually innocent under each of the alternative theories. The Garth dissent agreed with the majority on this point. Id. at 114 (Roth, J., dissenting) (agreeing that a petitioner must be actually innocent of all four alternative theories in order to be actually innocent of the offense charged, but, upon review of the record, finding that he was not actually innocent on one of the theories).