PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
———

No. 14-4284
———

CHARLES GRAY BRUCE,
a/k/a Charles Gary Bruce,

Appellant

v.

WARDEN LEWISBURG USP
———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 3-13-cv-02362)
District Judge:  Honorable Malachy E. Mannion
———

Argued:  October 26, 2016
Before:  FISHER,[*] VANASKIE, and KRAUSE,
*Circuit Judges*.

---

[*] Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

(Filed: August 22, 2017)

Rajeev Muttreja, Esq.  [ARGUED]
Jones Day
250 Vesey Street
New York, NY 10281
     *Counsel for Appellant*

Edward L. Stanton III, Esq.
John D. Fabian, Esq.
Kevin G. Ritz, Esq.  [ARGUED]
Office of United States Attorney
167 North Main Street, Suite 800
Memphis, TN 38103

Peter J. Smith, Esq.
Carlo D. Marchioli, Esq.
Mark E. Morrison, Esq.
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

Anthony D. Scicchitano, Esq.
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
     *Counsel for Appellee*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

Some 26 years ago in a small town located in western Tennessee, Danny Vine and Della Thornton were murdered. Vine's home-based business was robbed and burned down with his and Thornton's bodies inside. Not long after, state and local law enforcement began to suspect Charles Gary Bruce and three others. Federal authorities later became involved, leading to Bruce's 1996 conviction for various federal crimes, including two counts of witness tampering murder for killing Vine and Thornton. For his wrongdoing, Bruce received a sentence of life without parole plus ten years in prison.

Fifteen years later, the Supreme Court handed down *Fowler v. United States*, 563 U.S. 668 (2011), a decision that interpreted the statute under which Bruce was convicted. That statute makes it a crime "to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer . . . of the United States . . . of information relating to the . . . possible commission of a Federal offense." 18 U.S.C. § 1512(a)(1)(C). *Fowler* addressed situations like Bruce's, where the defendant killed a person with the intent to prevent communication with law enforcement officers in general but did not have federal officers in mind at the time of the offense. In light of *Fowler*, Bruce now claims that he was convicted of conduct that is not a crime under the statute.

Ordinarily, federal prisoners collaterally challenging their convictions or sentences must seek relief pursuant to the remedial framework set out in 28 U.S.C. § 2255. But Bruce

3

never pursued his current statutory interpretation argument on direct appeal or in his initial § 2255 motion. And § 2255(h) does not permit a second bite at the habeas apple for previously unavailable rules of statutory interpretation. Bruce instead invokes § 2255's saving clause, which allows a federal prisoner to seek a writ of habeas corpus under 28 U.S.C. § 2241 when § 2255's remedy "is inadequate or ineffective to test the legality of his detention." § 2255(e).

The District Court read our Circuit precedent as permitting Bruce to pass through the saving clause to § 2241, but declined to grant the writ. We hold that the District Court properly exercised jurisdiction under § 2241. And after careful review of the record, we also conclude that this is not the extraordinary case in which a successful showing of actual innocence has been made. The judgment of the District Court will therefore be affirmed.

I

A

In December 1990, Charles Gary Bruce (Gary Bruce or Bruce) was experiencing financial difficulty. Together with his brothers Jerry and Robert, Gary Bruce devised a scheme to rob a mussel shell camp in Camden, Tennessee operated by Danny Vine. The Bruces believed that Vine, a local mussel shell buyer, carried large amounts of cash and that his camp, being secluded in the woods, would be easy to rob.

Camden is located in Benton County, not far from the Kentucky Lake, a large artificial reservoir created by the impounding of the Tennessee River by the Kentucky Dam. During the 1990s, the harvesting, processing, and exportation of freshwater mussel shells was a thriving industry in Tennessee. Divers would take the shells from the Kentucky Lake or the Tennessee River and sell them to local buyers like

4

Vine, who served as purchasing agents for large companies. The buyers then transported their shells to the company for which they worked, where the meat was removed and the shells shipped overseas, most often to Japan. There, producers used the white lining of the mussel shells to manufacture cultured pearls.

On January 15, 1991, joined by their friend David Riales, the Bruces agreed that they would rob Vine's camp. They decided to kill anyone who was there and do whatever it took to take the shells. The following day, the group purchased several cans of gasoline from a local gas station and carried out their plan. When they arrived, Vine was present at the camp with his fiancée, Della Thornton, and their puppy. Gary Bruce tied up Vine and Thornton, who were both shot in the head at point-blank range with Gary's gun—Gary shot Vine, and Jerry shot Thornton. The group then poured gasoline on Vine and Thornton's bodies and throughout the house. Finally, they set the house ablaze and drove away with Vine's truck full of mussel shells.

Vine, Thornton, and their puppy's charred remains were discovered by the local sheriff's department three days later. Special Agent Alvin Daniel of the Tennessee Bureau of Investigation (TBI) was then assigned to the case. Through forensic evidence, state and local authorities identified Vine and Thornton as the victims and determined that the two had been shot in the head prior to the fire. The state fire marshal concluded that gasoline was used to set fire to the house and burn the bodies. Beyond that, investigators had limited physical evidence and no leads.

A few weeks after the murders, investigators learned of several suspicious sales of mussel shells by Gary Bruce's wife and brothers. At that point the Bruces became suspects. Ballistics testing, including a search warrant to recover bullets

5

fired into a tree on Gary Bruce's property, led Special Agent Daniel to determine that Bruce's gun was used to shoot Vine and Thornton. The investigation became drawn out, however, by the unwillingness of witnesses to speak to state and local law enforcement.

Eventually Daniel approached the local United States Attorney's Office for assistance. A federal grand jury investigation commenced to hear testimony from witnesses, several of whom later indicated that their fear of the Bruces prevented them from cooperating prior to the involvement of federal authorities. The Federal Bureau of Investigation and the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) also became involved.

B

On November 1, 1993, a grand jury sitting in the Western District of Tennessee issued an indictment charging Gary, Jerry, and Robert Bruce, as well as David Riales, each with two counts of witness tampering murder, in violation of 18 U.S.C. § 1512(a)(1)(C). The eight-count indictment also included charges of Hobbs Act robbery, conspiracy to commit Hobbs Act robbery, use of a firearm to commit robbery and murder, arson, use of fire to commit robbery and murder, and conspiracy to obstruct justice. Kathleen Bruce, the mother of the Bruce brothers, was also charged with conspiracy to obstruct justice, in addition to facing separate counts of lying to a grand jury and witness tampering by threat or intimidation.

Gary Bruce was detained at the McNary County, Tennessee jail pending trial. He escaped on July 27, 1994, and remained at large for 14 months. While a fugitive, a jury convicted Bruce's codefendants on all counts, except that Kathleen Bruce was acquitted of her witness tampering charge. The Sixth Circuit affirmed their convictions, *United States v.*

6

*Bruce*, 100 F.3d 957, 1996 WL 640468 (6th Cir. Nov. 5, 1996) (unpublished table decision), and the Supreme Court denied certiorari, 520 U.S. 1128 (1997).

Gary Bruce's trial commenced on July 29, 1996. As to the witness tampering murder counts, the district court instructed the jury that, to convict, it must find beyond a reasonable doubt (1) that Bruce killed another person, (2) with the intent to prevent the communication of information to a law enforcement officer, and (3) that the information related to the commission of a federal crime. J.A. 1004-05. No instruction was given that the potential communication of information needed to be to a federal law enforcement officer. The jury convicted Bruce on all counts, including a separately-indicted charge of escape. The district court sentenced Bruce to life without parole, plus another ten years for his pre-trial escape. The Sixth Circuit affirmed Bruce's convictions, *United States v. Bruce*, 142 F.3d 437, 1998 WL 165144 (6th Cir. Mar. 31, 1998) (per curiam) (unpublished table decision), and the Supreme Court denied certiorari, 525 U.S. 882 (1998).

Since his convictions became final, Bruce has unsuccessfully sought post-conviction relief several times, proceeding *pro se* throughout. In June 2008, Bruce filed a motion under 28 U.S.C. § 2255 in the United States District Court for the Western District of Tennessee. That court denied the motion. Both the district court and the Sixth Circuit denied a certificate of appealability. In 2012 and 2013, Bruce sought authorization to file second or successive § 2255 motions, but the Sixth Circuit denied those requests. It was not until the 2013 motion that Bruce invoked *Fowler v. United States*, 563 U.S. 668 (2011). In denying the 2013 motion, the Sixth Circuit reasoned that Bruce failed to satisfy § 2255(h)'s limitations on second or successive motions because *Fowler* created a rule of statutory interpretation, not constitutional law, and has not

7

been held by the Supreme Court to apply retroactively in cases on collateral review. *In re Bruce*, 2013 U.S. App. LEXIS 25436, at *4-5 (6th Cir. Aug. 2, 2013).

## II

On September 12, 2013, Bruce filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2241 in the United States District Court for the Middle District of Pennsylvania, the district of his confinement. Citing *Fowler*, Bruce contended that he is actually innocent of his two convictions for witness tampering murder.

The Magistrate Judge initially recommended that Bruce's petition be dismissed for lack of jurisdiction due to his failure to satisfy the gatekeeping requirements of 28 U.S.C. § 2255(e)'s saving clause. The following day, however, this Court decided *United States v. Tyler*, 732 F.3d 241 (3d Cir. 2013), which permitted a prisoner who had filed successive § 2255 motions to pursue a *Fowler*-based actual innocence claim under § 2241. In the wake of *Tyler*, the District Court declined to adopt the Magistrate Judge's recommendation, and remanded the matter for further proceedings.

On remand, the Magistrate Judge found that jurisdiction under § 2241 was proper, but recommended that Bruce's petition be denied. *Bruce v. Thomas*, 2014 WL 5242407 (M.D. Pa. June 20, 2014). The Magistrate Judge concluded that Bruce had failed to show that it was more likely than not that no reasonable juror would have convicted him of witness tampering murder based on *Fowler*'s interpretation of 18 U.S.C. § 1512(a)(1)(C). *Id.* at *10. The District Court adopted the Magistrate Judge's report and recommendation in its entirety and denied Bruce's petition. *Bruce v. Thomas*, 2014 WL 5242409 (M.D. Pa. Oct. 15, 2014).

Still proceeding *pro se*, Bruce timely filed a notice of

appeal.  The requirements for obtaining a certificate of appealability set forth in 28 U.S.C. § 2253(c) do not apply to prisoners appealing the denial of a § 2241 petition.  *See United States v. Cepero*, 224 F.3d 256, 264-65 (3d Cir. 2000) (en banc), *abrogated on other grounds by Gonzales v. Thaler*, 565 U.S. 134 (2012); *Burkey v. Marberry*, 556 F.3d 142, 146 (3d Cir. 2009).  We appointed Thomas S. Jones and Rajeev Muttreja of Jones Day to represent Bruce on appeal.  The Court thanks Messrs. Jones and Muttreja for accepting this matter *pro bono* and for their well-stated arguments.  Attorneys who act *pro bono* fulfill the highest service that members of the bar can offer to indigent parties and to the legal profession.

## III

It is appropriate to begin by addressing whether the District Court properly entertained Bruce's petition for a writ of habeas corpus under 28 U.S.C. § 2241.  Even though the Government agrees with Bruce that he may seek the writ, "every federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it."  *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986) (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)); *see Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 94-95 (1998).  That duty is especially pertinent in this case, there being an entrenched split among the courts of appeals regarding the extent to which a change in statutory interpretation permits a federal prisoner to resort to § 2241 for an additional round of collateral review.

## A

Since the Judiciary Act of 1789, Congress has authorized federal courts to issue writs of habeas corpus to federal prisoners.  Act of Sept. 24, 1789, ch. 20, § 14, 1 Stat.

9

82. The Reconstruction Congress later expanded the scope of the writ to reach state prisoners as well. Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385. That guarantee can be found in its current form at § 2241 of the Judicial Code, which provides that federal judges may grant the writ of habeas corpus on the application of a prisoner held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). The prisoner must direct his petition to "the person who has custody over him." § 2242; *see also Wales v. Whitney*, 114 U.S. 564, 574 (1885); *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 494-95 (1973). Longstanding practice under this immediate custodian rule "confirms that in habeas challenges to present physical confinement . . . the default rule is that the proper respondent is the warden of the facility where the prisoner is being held." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004). And under the statute's jurisdiction of confinement rule, district courts may only grant habeas relief against custodians "within their respective jurisdictions." § 2241(a); *see also Braden*, 410 U.S. at 495 ("[T]he language of § 2241(a) requires nothing more than that the court issuing the writ have jurisdiction over the custodian.").

An increase in the number of federal habeas petitions produced serious administrative problems and overburdened the few district courts in the jurisdictions with major federal prisons. *See United States v. Hayman*, 342 U.S. 205, 210-19 (1952). Congress responded in 1948 by enacting 28 U.S.C. § 2255. Pub. L. No. 80-773, ch. 646, 62 Stat. 967-68. A new remedial mechanism, § 2255 "replaced traditional habeas corpus for federal prisoners (at least in the first instance) with a process that allowed the prisoner to file a motion with the sentencing court on the ground that his sentence was, *inter alia*, imposed in violation of the Constitution or laws of the United

States." *Boumediene v. Bush*, 553 U.S. 723, 774 (2008) (internal quotation marks omitted). The statute's "sole purpose was to minimize the difficulties encountered in habeas corpus hearings by affording the same rights in another and more convenient forum." *Hayman*, 342 U.S. at 219; *see also Hill v. United States*, 368 U.S. 424, 427, 428 n.5 (1962) (describing the § 2255 remedy as "exactly commensurate" with § 2241's writ of habeas corpus); *United States v. Anselmi*, 207 F.2d 312, 314 (3d Cir. 1953).

So it is that a federal prisoner's first (and most often only) route for collateral review of his conviction or sentence is under § 2255. Indeed, § 2255 provides that a habeas petition filed in the prisoner's district of confinement "*shall not be entertained* if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief." § 2255(e) (emphasis added). But to this limitation, Congress also provided a saving clause: a federal prisoner may resort to § 2241 only if he can establish that "the remedy by motion [under § 2255] is inadequate or ineffective to test the legality of his detention." *Id.*; *see also Boumediene*, 553 U.S. at 776 (discussing § 2255's "saving clause"). *See generally* Bryan A. Garner, *Garner's Dictionary of Legal Usage* 797 (3d ed. 2011) ("*[S]aving* is the precise word" for "a statutory provision exempting from coverage something that would otherwise be included").

With the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, Congress added significant gatekeeping provisions to § 2255, while at the same time leaving the statute's saving clause untouched. Under AEDPA, a federal prisoner may only file a second or successive motion under § 2255 on the basis of "newly discovered evidence" or "a new rule of constitutional law, made retroactive to cases on

11

collateral review by the Supreme Court, that was previously unavailable." § 2255(h). No exception exists for new non-constitutional rules, even if that rule was previously unavailable and applies retroactively in cases on collateral review. By omitting such an exception, "Congress seems to have lost sight of the fact that federal convicts more often can raise federal statutory claims in their collateral attacks—notably in cases in which the federal criminal statute under which a prisoner was convicted has since been authoritatively interpreted more narrowly." Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer, & David L. Shapiro, *Hart and Wechsler's The Federal Courts and the Federal System* 1362 (7th ed. 2015).

We first addressed that scenario one year after AEDPA's enactment. *In re Dorsainvil*, 119 F.3d 245 (3d Cir. 1997), involved a prisoner convicted of using a firearm during the commission of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1). After Ocsulis Dorsainvil's initial § 2255 motion, the Supreme Court decided *Bailey v. United States*, 516 U.S. 137 (1995). *Bailey* held as a matter of statutory interpretation that § 924(c)(1)'s "use" prong reaches only "active employment of the firearm" as opposed to mere possession. *Id.* at 144. Dorsainvil then asked this Court for permission to file a second or successive § 2255 motion, arguing that *Bailey* rendered noncriminal the conduct for which he was convicted. Because *Bailey* was a new statutory rule, not a new constitutional one, we denied Dorsainvil's request. *Dorsainvil*, 119 F.3d at 248.

Dorsainvil argued in the alternative, however, that if AEDPA prevented him from pursuing his *Bailey* argument, then he should be able to resort to the writ of habeas corpus under § 2241. We agreed. "Were no other avenue of judicial review available for a party who claims that s/he is factually or

12

legally innocent as a result of a previously unavailable statutory interpretation," the Court observed that it "would be faced with a thorny constitutional issue." *Id.* We accordingly concluded that it would be a "complete miscarriage of justice to punish a defendant for an act that the law does not make criminal," thus rendering § 2255 "'inadequate or ineffective to test the legality of [Dorsainvil's] detention.'" *Id.* at 251 (brackets in original; quoting § 2255(e)). And so the Court held that in the unusual situation where an intervening change in statutory interpretation runs the risk that an individual was convicted of conduct that is not a crime, and that change in the law applies retroactively in cases on collateral review, he may seek another round of post-conviction review under § 2241. *Id.*

The issue we confronted in *Dorsainvil* has since been addressed by every regional circuit. Nine of our sister circuits agree, though based on widely divergent rationales, that the saving clause permits a prisoner to challenge his detention when a change in statutory interpretation raises the potential that he was convicted of conduct that the law does not make criminal. *See Trenkler v. United States*, 536 F.3d 85, 99 (1st Cir. 2008); *Poindexter v. Nash*, 333 F.3d 372, 378 (2d Cir. 2003); *In re Jones*, 226 F.3d 328, 333-34 (4th Cir. 2000); *Reyes-Requena v. United States*, 243 F.3d 893, 903-04 (5th Cir. 2001); *Wooten v. Cauley*, 677 F.3d 303, 307-08 (6th Cir. 2012); *Brown v. Caraway*, 719 F.3d 583, 586-87 (7th Cir. 2013); *Abdullah v. Hedrick*, 392 F.3d 957, 963-64 (8th Cir. 2004); *Marrero v. Ives*, 682 F.3d 1190, 1192 (9th Cir. 2012); *In re Smith*, 285 F.3d 6, 8 (D.C. Cir. 2002). Two circuits see things differently, holding that an intervening change in statutory interpretation cannot render § 2255 inadequate or ineffective. *See Prost v. Anderson*, 636 F.3d 578, 588 (10th Cir. 2011) (Gorsuch, J.); *McCarthan v. Director of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1099-1100 (11th Cir.

13

2017) (en banc), *petition for cert. filed sub nom. McCarthan v. Collins*, No. 17-85 (U.S. July 12, 2017).

Even within the circuits that permit actual innocence claims based on changes in statutory interpretation, there is a deep divide as to when § 2255 is inadequate or ineffective in this context. That split is illustrated by the present case. As will be explained, this Court concludes that the saving clause requires that Gary Bruce be permitted to resort to § 2241 for another round of collateral review. But Robert Bruce—who, like his brother, was convicted of federal witness tampering murder for killing Danny Vine and Della Thornton, and sentenced to life without parole—could not. *See Bruce v. Warden,* 658 F. App'x 935 (11th Cir. 2016) (per curiam), *cert. denied sub nom. Bruce v. Drew*, 137 S. Ct. 683 (2017). Before the Eleventh Circuit's en banc decision earlier this year in *McCarthan,* that court's precedent held that the saving clause allows prisoners to assert actual innocence claims under § 2241 based on a retroactive change in statutory law, but only if applicable circuit precedent foreclosed such an argument at the time of the prisoner's direct appeal and initial § 2255 motion. *See Zelaya v. Sec'y, Fla. Dep't of Corr.*, 798 F.3d 1260, 1371 (11th Cir. 2015). Because Sixth Circuit precedent did not foreclose the kind of argument later accepted by the Supreme Court in *Fowler* until years after Robert Bruce's first § 2255 motion in 1998, *see United States v. Carson*, 560 F.3d 566, 579-82 (6th Cir. 2009), the Eleventh Circuit held that the district court lacked jurisdiction to consider his actual innocence claim under § 2241, *see* 658 F. App'x at 939.

This Court's precedent does not contain a similar limitation. Our Circuit permits access to § 2241 when two conditions are satisfied: First, a prisoner must assert a "claim of 'actual innocence' on the theory that 'he is being detained for conduct that has subsequently been rendered non-criminal

14

by an intervening Supreme Court decision' and our own precedent construing an intervening Supreme Court decision"—in other words, when there is a change in statutory caselaw that applies retroactively in cases on collateral review. *Tyler*, 732 F.3d at 246 (quoting *Dorsainvil*, 119 F.3d at 252). And second, the prisoner must be "otherwise barred from challenging the legality of the conviction under § 2255." *Id.* Stated differently, the prisoner has "had no earlier opportunity to challenge his conviction for a crime that an intervening change in substantive law may negate." *Dorsainvil*, 119 F.3d at 251. It matters not whether the prisoner's claim was viable under circuit precedent as it existed at the time of his direct appeal and initial § 2255 motion. What matters is that the prisoner has had no earlier opportunity to test the legality of his detention since the intervening Supreme Court decision issued.

While differences in the law amongst the circuits is a feature, not a bug, of our federal judicial system, the disparate treatment of Gary and Robert Bruce should not be overlooked. When it comes to their actual innocence claims, the two Bruce brothers are similarly situated in all respects but one: they are incarcerated in federal prisons located in different circuits. Yet as already noted, by enacting § 2255 Congress sought to alleviate the inefficiencies that attend § 2241's immediate custodian and district of confinement rules. Now those difficulties have returned, though in a new form. And so they will remain, at least until Congress or the Supreme Court speaks on the matter.

B

Against this background, we now consider whether the District Court properly exercised jurisdiction under § 2241.

The witness tampering murder statute prohibits the "kill[ing] or attempt[ed] kill[ing]" of "another person, with

15

intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(a)(1)(C). With regard to the defendant's intent, a related subsection of the statute provides that "no state of mind need be proved with respect to the circumstance . . . that the law enforcement officer is an officer or employee of the Federal Government." § 1512(g)(2).

As this Court recognized in *Tyler*, the Supreme Court's *Fowler* decision interpreted the witness tampering murder statute in a manner that gave the statute a narrower reach than that previously permitted by our Circuit precedent. 732 F.3d at 251-52. Prior to *Fowler*, this Court held that § 1512(a)(1)(C) requires the Government to prove that "the officers with whom the defendant believed the victim might communicate *would in fact be federal officers*." *United States v. Bell*, 113 F.3d 1345, 1349 (3d Cir. 1997). And as already noted, the jury at Bruce's trial in the Western District of Tennessee was instructed under an even more lenient standard: *no instruction* was given that the victim might communicate with a federal officer. *Fowler* adopted a different approach: the Government must now prove that it was "*reasonably likely* under the circumstances that (in the absence of the killing) at least one of the relevant communications would have been made to a federal officer." 563 U.S. at 677-78 (emphasis added). Because Bruce was convicted under a lesser standard than that required by *Fowler*, there stands a chance that he is incarcerated for conduct that does not constitute a crime. As this change in the law did not occur until 2011—long after Bruce's convictions became final, and months after the denial of his initial § 2255 motion—he had no earlier opportunity to test of legality of his detention under *Fowler*.

We further conclude that the change in the law brought

16

about by *Fowler* applies retroactively in cases on collateral review. The established framework for determining the retroactive effect of new rules was set forth in the plurality opinion in *Teague v. Lane*, 489 U.S. 288 (1989). That framework applies as much in a federal collateral challenge to a federal conviction as it does in a federal collateral challenge to a state conviction. *United States v. Reyes*, 755 F.3d 210, 213 (3d Cir. 2014). *But cf. Welch v. United States*, 136 S. Ct. 1257, 1264 (2016) (assuming without deciding that *Teague* applies to federal collateral review of federal convictions). *Teague* concluded that, as a general matter, new constitutional rules of criminal procedure do not apply retroactively to convictions that are already final. Two categories of new rules fall outside this general bar. First are "[n]ew *substantive* rules." *Schriro v. Summerlin*, 542 U.S. 348, 351 (2004); *see Teague*, 489 U.S. at 307, 311. Second are "new watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Schriro*, 542 U.S. at 352 (internal quotation marks omitted); *see Saffle v. Parks*, 494 U.S. 484, 495 (1990); *Teague*, 489 U.S. at 311-13.

It is quite clear that the rule set forth in *Fowler* is new. "A case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301. It is equally clear that the rule announced in *Fowler* is a substantive one. "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." *Schriro*, 542 U.S. at 353. "This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Id.* at 351-52 (citation omitted). In such circumstances, "where the conviction or sentence is not in fact

17

authorized by substantive law, then finality interests are at their weakest." *Welch*, 136 S. Ct. at 1266. By interpreting the witness tampering murder statute, *Fowler* narrowed its scope. *Fowler* therefore announced a new rule of substantive law that applies retroactively in cases on collateral review. *Accord United States v. Smith*, 723 F.3d 510, 515 (4th Cir. 2013).

The constitutional foundation for the retroactive application of new substantive rules lends further support to *Dorsainvil*'s interpretation of § 2255's saving clause. Decisions of the Supreme Court "holding that a substantive federal criminal statute does not reach certain conduct . . . necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal.'" *Bousley v. United States*, 523 U.S. 614, 620 (1998) (quoting *Davis v. United States*, 417 U.S. 333, 346 (1974)); *see also Dorsainvil*, 119 F.3d at 250-51. And because it is a first principle of the separation of powers that "it is only Congress, and not the courts, which can make conduct criminal," *Bousley*, 523 U.S. at 620-21; *see United States v. Hudson*, 11 U.S. (7 Cranch) 32 (1812), a court is "prohibited from imposing criminal punishment beyond what Congress in fact has enacted by a valid law." *Welch*, 136 S. Ct. at 1268. It is for these reasons that "*Teague*'s conclusion establishing the retroactivity of new substantive rules is best understood as resting upon constitutional premises." *Montgomery v. Louisiana*, 136 S. Ct. 718, 728 (2016).

In light of these principles, the significant constitutional concerns we expressed in *Dorsainvil* are manifest. The Constitution dictates that "[a] conviction and sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, void." *Id.* at 731 (citing *Ex parte Siebold*, 100 U.S. 371, 376 (1880)). "It follows, as a general principle, that a court has no authority to leave in place

18

a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced." *Id.* Of signal importance, it is "uncontroversial . . . that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779 (quoting *INS v. St. Cyr*, 533 U.S. 289, 302 (2001)). Foreclosing a prisoner from even having an opportunity to assert his actual innocence in light of an intervening Supreme Court decision announcing a new substantive rule would challenge one of the writ's core guarantees. Thus, as we concluded in *Dorsainvil* and reaffirm today, for a prisoner in those circumstances § 2255's remedy is "inadequate or ineffective to test the legality of his detention." § 2255(e).

We therefore hold that the District Court properly exercised jurisdiction under 28 U.S.C. § 2241. Past decisions of this Court permitting a prisoner to pass through the saving clause to assert an actual innocence claim have sent the case back to the district court to consider the merits of that claim in the first instance. Our prior cases confronted only a threshold jurisdictional determination, however; the district courts in those cases did not reached the merits of the underlying claims. In *Dorsainvil* we denied the prisoner's motion for a second or successive § 2255 motion without prejudice to his proceeding under § 2241. 119 F.3d at 252. And in *Tyler* we remanded the matter to the district court for an evidentiary hearing on the prisoner's actual innocence claims. 732 F.3d at 246-47, 252-53. The present case arrives in a different posture. Here the District Court, in accord with our Circuit precedent, concluded that it had jurisdiction under § 2241 and rejected Bruce's *Fowler*-based actual innocence claim.

19

## C

Having assured ourselves of the District Court's jurisdiction, we shall proceed to consider the merits of this appeal. We have jurisdiction to do so under 28 U.S.C. §§ 1291 and 2253(a). As no evidentiary hearing was held below, we are presented solely with the District Court's legal conclusion to deny Bruce's petition for a writ of habeas corpus, which we shall review *de novo*. *Woodall v. Federal Bureau of Prisons*, 432 F.3d 235, 239 n.3 (3d Cir. 2005).

## IV

This leads to the question whether Gary Bruce was convicted of conduct that is not a crime in light of *Fowler*. It should be observed that we are venturing into something of a habeas corpus frontier, this being the first case in which this Court has considered the merits of an actual innocence claim under § 2241.

## A

The Supreme Court has yet to decide whether a prisoner can obtain habeas relief based on a freestanding claim of actual innocence, having left the matter open time and again. *Herrera v. Collins*, 506 U.S. 390, 404-05 (1993); *House v. Bell*, 547 U.S. 518, 554-55 (2006); *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 71-72 (2009). That does not mean, however, that innocence is irrelevant: a prisoner's proof of actual innocence may provide a gateway for federal habeas review of procedurally defaulted or untimely claims of constitutional error. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931-32 (2013). Bruce's actual innocence claim does not come to us as a gateway issue. He is not seeking to demonstrate his innocence so as to proceed with some otherwise defaulted or untimely claim, but to obtain full habeas

relief. If Bruce were indeed asserting a freestanding actual innocence claim, "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Herrera*, 506 U.S. at 417.

We need not resolve whether Bruce's actual innocence claim is a freestanding one. This Court's precedent instructs that actual innocence claims under § 2241 are to be initially tested against the more relaxed (but still stringent) actual innocence gateway standard. *Tyler*, 732 F.3d at 246. To succeed under that standard, a petitioner must "demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (internal quotation marks omitted). In order "to balance the societal interests in finality . . . and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case," *Schlup v. Delo*, 513 U.S. 298, 324 (1995), the gateway standard is purposefully "demanding" and was formulated to ensure that a successful petitioner's case is "truly extraordinary." *House*, 547 U.S. at 537-38 (internal quotation marks omitted); *see also McQuiggin*, 133 S. Ct. at 1928 (cautioning that "tenable actual-innocence gateway pleas are rare"). A petitioner can meet this standard "by demonstrating an intervening change in law that rendered his conduct non-criminal." *Tyler*, 732 F.3d at 246. Failure to meet the gateway standard is sufficient to reject any hypothetical freestanding actual innocence claim. *Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007); *see also House*, 547 U.S. at 555 (noting that a freestanding actual innocence claim would require "more convincing proof of innocence" than that needed to meet the gateway standard).

Because "'actual innocence' means factual innocence, not mere legal insufficiency," the Government "is not limited to the existing record to rebut any showing that [the] petitioner

may make." *Bousley*, 523 U.S. at 623-24. A habeas court is therefore "not bound by the rules of admissibility that would govern at trial," but must instead "make its determination 'in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Schlup*, 513 U.S. at 327-28 (quoting Henry J. Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U. Chi. L. Rev. 142, 160 (1970)). With this broader array of evidence in view, the district court does not exercise its "independent judgement as to whether reasonable doubt exists"; rather, the actual innocence standard "requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329. And it must be presumed, moreover, that a reasonable juror "would consider fairly all of the evidence presented" and "conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.*

After *Fowler*, a conviction for witness tampering murder requires the Government to prove: (1) the defendant killed or attempted to kill a person; (2) the defendant was motivated by a desire to prevent the communication between any person and law enforcement authorities concerning the commission or possible commission of an offense; (3) that offense was actually a federal offense; and (4) *a reasonable likelihood* that the person whom the defendant believes may communicate with law enforcement *would in fact* make a relevant communication with a federal law enforcement officer. *Tyler*, 732 F.3d at 252. Bruce's actual innocence claim focuses solely on the reasonable likelihood element.

Establishing a reasonable likelihood requires "evidence—not merely argument of the witness's cooperation

22

with law enforcement." *Id.* (internal quotation marks omitted). The statute nevertheless reaches conduct that "takes place before the victim has engaged in any communication at all with law enforcement officers—at a time when the precise communication and nature of the officer who may receive it are not yet known." *Fowler*, 563 U.S. at 673. And in this regard, the Government "need not prove that a federal investigation was in progress at the time the defendant committed a witness-tampering offense." *Tyler*, 732 F.3d at 252 (brackets and internal quotation marks omitted). Nor must the Government show that such a communication, "had it occurred, would have been federal beyond a reasonable doubt." *Fowler*, 563 U.S. at 678. The Government need only show that "the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* This is a "relatively low bar." *Smith*, 723 F.3d at 518.

Of course, the bar is low for the Government *at trial*. "Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera*, 506 U.S. at 399; *see also Schlup*, 513 U.S. at 326 n.42 (A habeas petition asserting an actual innocence claim "comes before the habeas court with a strong—and in the vast majority of the cases conclusive—presumption of guilt."). So the Government's low bar is instead a high hurdle for Bruce. Compounded with the extraordinary showing needed to establish his innocence, Bruce's burden of proof is a heavy one.

B

Applying these principles, we now address whether it is more likely than not that any reasonable juror would have reasonable doubt that Gary Bruce killed Danny Vine and Della Thornton to prevent them from communicating with a federal

law enforcement officer. Three sets of considerations to be discussed demonstrate why, in our view, Bruce cannot make this extraordinary showing.

First, Bruce's robbery and arson were undisputed federal offenses. Vine ran an interstate shell buying business out of his home. The mussel shells that Bruce and his cohorts stole were later sold in Kentucky. And the ATF has authority to investigate suspicious fires at commercial locations, *see* 18 U.S.C. §§ 844(i) and 846, as it eventually did in this very case.

To be sure, "when a defendant acts in ways that violate state criminal law, some or all of those acts will violate federal criminal law as well." *Fowler*, 563 U.S. at 676. *Fowler* gave the enforcement of marijuana offenses as an example of federal-state overlap. *Id.* at 677. But the armed robbery and arson of an interstate business is a far cry from a marijuana offense and even further afield from being a crime that would raise significant federalism concerns. The *Fowler* Court "certainly did not suggest that, when other evidence demonstrated a reasonable likelihood of communication with a federal officer, the fact that the underlying crime could have been prosecuted under both state and federal law precluded prosecution under" the witness tampering murder statute. *United States v. Ramos-Cruz*, 667 F.3d 487, 498 (4th Cir. 2012); *see also United States v. Veliz*, 800 F.3d 63, 75 (2d Cir. 2015) (noting in the context of 18 U.S.C. § 1512(b)(3), the materially identical witness tampering statute, that "the very fact that communication with federal officials took place months after [the defendant's] solicitations lends some support to a finding that the communications were reasonably likely at the time of the solicitations").

Furthermore, the fact that a federal investigation ultimately occurred after Vine and Thornton's murder is probative evidence of the likelihood that they would have

24

eventually communicated with a federal officer. Had either survived, it is scarcely remote, outlandish, or simply hypothetical that they would have communicated with one of the FBI or ATF agents assigned to the investigation. And to the extent TBI Special Agent Daniel and other Tennessee officers participated in the investigation after federal intervention, they too would count as federal officers. *See* 18 U.S.C. § 1515(a)(4) (for purposes of the witness tampering murder statute a "law enforcement officer" includes "a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant").

Bruce makes much of the two-year gap between the crime and the involvement of federal authorities. He argues that *Fowler* requires "objective proof that federal involvement was reasonably likely at the time of the victim's death," and that this proof must be "particular to the victim." Bruce Br. 17 (emphasis deleted). But under *Fowler* temporal remoteness has to do with the degree of likelihood of federal involvement. Congress intended the statute to apply "where the defendant killed the victim before the victim had decided to communicate to law enforcement officers." *Fowler*, 568 U.S. at 676. And here, the very reason for the two-year interval is exactly why federal involvement became necessary.

That leads to the second consideration to be discussed. The record from Bruce's trial confirms that, consistent with the Bruce family's long-held history of violence, their campaign of fear and witness intimidation stymied the state investigation, making federal intervention essential. Indeed, Bruce admitted as much while detained pre-trial at the McNary County, Tennessee jail. There, Gary and Jerry Bruce got to know a fellow inmate named James McGrogan. The two brothers expressed to McGrogan their belief that they owned and ran Benton County and that "nobody was supposed to interfere

25

with them [or] their family." J.A. 694. Were any witnesses to testify against the Bruces "they would be sorry." *Id.* The brothers also explained how they hoped that "other members of their family would be able to frighten some people" so their case "would never come to trial." J.A. 701. And just before Gary Bruce began his escape from the jail, "his last words were that there wouldn't be any witnesses or their fucking families." J.A. 708.

Several key witnesses testified at Bruce's trial that they were too scared to cooperate until the federal investigation began. Ralph Sentell, Jr. owned the gas station where Gary, Jerry, and Robert Bruce filled several containers of gasoline the night of the murders. Sentell initially did not cooperate with state investigators because, having known Gary Bruce for twenty years, he was scared of the Bruces' "reputation and what they were capable of doing." J.A. 649-50. After Sentell testified to the federal grand jury, Gary Bruce tried to intimidate Sentell by lingering around the gas station. This scared Sentell, who began carrying a pistol and asked the FBI and TBI at least twenty times if he could be placed in a witness protection program.

Patricia Odham hosted a party at her trailer the day before the murders. It was there that Bruce and others agreed they would rob Vine's shell camp. Odham knew the Bruce family well and was afraid she would be killed if she cooperated with the investigation. When Odham was first interviewed by Special Agent Daniel, she did not say anything about the party. Despite this, suspicious things began happening at her property; after Odham had her then-boyfriend Mike Franklin speak to Bruce, the events stopped. Odham eventually moved to Alabama with Franklin and did not cooperate until at least a year and a half after the murders.

Ira Travis is a first cousin of the Bruces who has known

the family his entire life. He was present when the robbery was planned at Odham's trailer, but declined to participate in its execution. Travis initially told Special Agent Daniel that he knew nothing. Due to his familiarity with the Bruces and "what they do," Travis feared for his and his family's safety. J.A. 544. He eventually fled Tennessee for nearly five years, and did not cooperate with authorities until he met with federal investigators in January 1996.

Tammy Rayburn was offered money from Robert Bruce to supply an alibi for the murders. Rayburn, who had previously dated Robert, did not come forward with this information for several years because she was scared of the Bruces. Rayburn's fear was due in part to stalking by Kathleen Bruce, who would park her car next door to Rayburn's house and stare at Rayburn.

John Norrell saw David Riales speed away from Vine's house in Vine's truck the night of the murders. Due to hearing "rumors of people being murdered and threatened," Norrell did not approach the authorities with this information for a year and a half. J.A. 751. When Norrell learned of Gary Bruce's pre-trial escape from jail, he feared for his life and considered entering a witness protection program. He was instead given $4,000 from the FBI to move out of state.

Other testimony from Bruce's trial detailed the Bruce family's efforts to intimidate witnesses. Shannon Irwin was dating Robert Bruce at the time of the murders and later married Jerry Bruce. After Special Agent Daniel interviewed Irwin, Kathleen Bruce began to follow her around town. Later, Gary Bruce told Irwin that "he could kill [Irwin] and his momma right there and it would never be on his conscience." J.A. 789-90.

Wayne Decker spoke with Special Agent Daniel after the federal grand jury investigation started. Decker had known

27

the Bruces for more than thirty years. After observing Daniel serve Decker with a subpoena, Gary and Robert Bruce confronted Decker. Knowing "the way [the Bruces] operate and the way they live," Decker lied to the Bruces about what he had told Daniel so as to not "put [himself] in danger." J.A. 818, 822.

Danny Vine's father Larry Vine was also subject to the Bruces' intimidation. A couple months after the murders, Gary and Jerry Bruce ran Larry Vine off the road with their truck. Another time, Jerry Bruce cut Larry Vine off at an intersection and stared him down. Other members of the Bruce family would make obscene gestures at Larry Vine anytime they saw him around Camden.

Gary Bruce even threatened Special Agent Daniel. Prior to federal intervention, when Tennessee authorities executed a search warrant on Bruce's property, Bruce made several violent taunts threatening to kill Daniel. Among other things, Bruce told Daniel: "Had I known you were coming, I would have met you down the road with a rifle, and you would have never made it up on the property." J.A. 837.

Third and finally, additional evidence outside of Bruce's trial record confirms that federal involvement was necessary and inevitable. Mike Franklin was present at Patricia Odham's trailer when Bruce and others planned to rob Vine's shell camp. Franklin was dating Odham at the time and was close with Gary Bruce. At the April 1995 trial of Bruce's codefendants, he testified that he and Odham moved to Alabama because they were nervous about things in Benton County. Franklin did not cooperate with authorities until he and Odham reached out to Special Agent Daniel about a year and a half after the murders. Also at the 1995 trial, Ralph Sentell testified that Gary Bruce tried to intimidate him into lying about whether the Bruces bought gas at Sentell's station

the night of the murders. And ATF Special Agent Mark Teufert likewise explained that, despite efforts from authorities in multiple states, Ira Travis could not be located in time for the 1995 trial.

At Jerry Bruce's September 1994 bond hearing, Benton County sheriff's deputy Robert Weller testified about the Bruce family's reputation. He detailed how the Bruces attempted to intimidate Special Agent Daniel to "slow up the possibility of gaining new evidence." J.A. 181. Weller also explained that "[i]t's hard to investigate the family" because sheriff's deputies were "scared of them." J.A. 194, 201. For local law enforcement, the approach was: "If you're going to stop a Bruce, make sure you have backup. If you're going to call, make sure you have somebody else with you. And, generally, if you don't have to mess with them, don't mess with them." J.A. 176.

The federal nature of Bruce's crimes, the evidence produced by the Government at his trial, and additional record evidence all clearly establish that the Bruce family had a long-standing history of violence that was well-known to members of the community before the murders. The Bruces' reputation manifested itself later as witnesses were intimidated from cooperating until after federal authorities became involved. Much of the evidence in this case consists of post-offense acts of Gary Bruce and his codefendants that demonstrate a continuous plan to avoid prosecution for the events of January 16, 1991. These facts defeat Bruce's present assertion that the two-year interval between the murders and the involvement of federal authorities undermines the reasonable likelihood that Vine and Thornton would have made a "relevant communication with a federal law enforcement officer." *Tyler*, 732 F.3d at 252. It should be noted, however, that post-offense acts are appropriately considered here given the wide-open

29

evidentiary universe that attends this actual innocence proceeding.  While evidence of post-offense acts can certainly be relevant to any reasonable likelihood determination, the weight of such evidence may present a different question at trial, when constraints on the admissibility of evidence are in play.  That question is not considered in this case.

In sum, the Court holds that any reasonable juror faced with "'all the evidence,'" *Schlup*, 513 U.S. at 328 (quoting Friendly, 38 U. Chi. L. Rev. at 160), would conclude that, had Danny Vine and Della Thornton survived, the likelihood that they would have communicated with a federal officer was more than remote, outlandish, or simply hypothetical.  It therefore follows that any reasonable juror would convict Bruce of witness tampering murder.

*     *     *

Charles Gary Bruce has now been afforded a meaningful opportunity to demonstrate his innocence in light of the Supreme Court's decision in *Fowler*.  For the reasons stated, that is an extraordinary showing he cannot make.  The judgment of the District Court will be affirmed.