**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-1022
_____

ROBERT C. CORDARO,
Appellant

v.

UNITED STATES OF AMERICA
_____

On Appeal from the United States District Court for the
Middle District of Pennsylvania
(No. 3-17-cv-00215)
District Judge:  Honorable A. Richard Caputo

Argued:  September 26, 2018

Before:  AMBRO, CHAGARES, and GREENAWAY, JR.,
<u>Circuit</u> <u>Judges</u>.

(Filed: August 5, 2019)

Brian T. Kelly **[ARGUED]**
Charles Dell'Anno
Nixon Peabody
Exchange Place

53 State Street
Boston, MA 02109

Counsel for Appellant

Stephen R. Cerutti, II **[ARGUED]**
Office of United States Attorney
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

Counsel for Appellee

_____

OPINION OF THE COURT
_____

CHAGARES, Circuit Judge.

In 2011, Robert Cordaro was convicted of bribery, extortion, and racketeering, along with other crimes. At his trial, the court instructed the jury that those crimes required an "official act." In 2016, however, the Supreme Court clarified what does — and does not — constitute an "official act" in McDonnell v. United States, 136 S. Ct. 2355 (2016). Cordaro believes that the McDonnell decision makes his conduct noncriminal and so petitions for a writ of habeas corpus under 28 U.S.C. § 2241. The District Court correctly concluded that Cordaro cannot show that he is actually innocent — that is, that it is more likely than not that no reasonable juror properly charged under McDonnell would have convicted him. We will affirm.

## I.

In November 2003, Cordaro and his co-defendant A.J. Munchak were elected as two of the three county commissioners for Lackawanna County, Pennsylvania. They began exploiting their positions for financial gain almost right after their terms began in January 2004, particularly with two local engineering firms, Acker Associates and Highland Associates.

### A.

Acker Associates is a civil-engineering firm whose principals are Ken Acker and P.J. McLaine. In 2003 and 2004, about 30 percent of Acker Associates' business was municipal engineering, mostly for Lackawanna County. McLaine testified that he actively supported Cordaro's opponents in the 2003 campaign. When Cordaro and Munchak were elected, McLaine was concerned about keeping Acker Associates' current county contracts. McLaine brought those concerns to Al Hughes, a close friend of Cordaro, who agreed to talk to Cordaro to see if McLaine could meet with him and "do something about it." Joint Appendix ("J.A.") 523 (McLaine).

Hughes arranged for McLaine to meet with Cordaro in early 2004, telling McLaine to bring a list of the existing work that Acker Associates did for the county. McLaine's list included a contract to work on the Lackawanna Watershed 2000 Program, a multi-year watershed project based on a $30 million congressional grant. McLaine testified that the grant was in the county commissioners' names and that they had hired Acker Associates for the work. When work started on the watershed project in 2003, Acker Associates brought on

3

seven new employees and bought a new truck and computer. McLaine's list also included contracts to work on the Main Street Bridge in Taylor, Pennsylvania, and the Gilmartin Street Bridge in Archbald, Pennsylvania; work for the Lackawanna County Community Development and Redevelopment Authority, Housing Authority, River Basin Authority, and Valley Authority; and other work related to surveying, paving, and mapping.

Cordaro and McLaine met in person. McLaine testified that Cordaro told him, "I think I can let you keep that, . . . but you have to make sure you let us know everything that's going on. And if we're having fundraisers you're going to have to participate and support us." J.A. 526; see also J.A. 593 (McLaine) ("So, if they have an affair, a fundraiser, that we have to participate."). McLaine agreed and "felt wonderful" after the meeting. J.A. 526.

In late spring or summer 2004, McLaine received a call from another engineering firm, CECO Associates, saying that it was taking over the design aspects of the Taylor Bridge contract. McLaine called Hughes, who called Cordaro. Again Hughes set up a meeting with McLaine and Cordaro, at which McLaine explained the phone call and argued that Acker Associates should keep the contract. Cordaro "thought for a few minutes and said, 'P.J., you can keep the contract. . . . Call CECO and tell them that you're going to finish the project.'" J.A. 528–29 (McLaine). McLaine "called CECO and told him [that Acker Associates was] going to finish the project. They said okay." J.A. 529.

In fall 2004, McLaine got a call from the lead consultants of the Lackawanna Watershed 2000 Program.

4

They asked to sit down with McLaine to discuss the project's progress and schedule. At this meeting, the consultants said that they were considering splitting up the project and giving parts out to other firms.

Again McLaine called Hughes, who called Cordaro. Hughes testified that Cordaro asked him, "[d]o you think he'd want to help, you know, supporting — supporting us — supporting me to keep his work?" J.A. 621. Hughes responded, "how much money would you think would be legitimately, you know, to give for the work," and Cordaro said "maybe $15,000." J.A. 621–22 (Hughes).[1]

After this conversation with Cordaro, Hughes told McLaine that if he gave him $10,000 a month for Cordaro, Hughes could guarantee that Acker Associates would keep all of its existing work. McLaine asked whether he would lose his work if he did not pay, and Hughes said that he probably would. Hughes also asked whether McLaine knew the principals of Highland Associates — he did — and whether McLaine would convey the same arrangement to them. McLaine agreed to call Highland Associates, but said he would need to talk to his partner Ken Acker before Acker Associates agreed to the payments.

---

[1] Hughes's testimony appears to conflate the conversation he had with Cordaro in mid-2004 (about CECO Associates and the Taylor Bridge project) and the one in late 2004 in which this exchange occurred, see J.A. 619–23, but his testimony and McLaine's are consistent on the fact that the conversation about payments occurred in late 2004, see J.A. 529–31, 619–23.

McLaine and Ken Acker discussed the matter. Acker asked McLaine whether they could lose their contracts if they did not pay, and McLaine said that according to Hughes they could. They decided that they did not want to take the chance, given the employees they had hired and the money they had invested because of their county contracts, especially the watershed project. They decided to go along.

Payments began in January 2005. For the first payment, McLaine and Acker paid themselves bonuses by check, cashed the checks, and delivered the cash to Hughes. They paid cash for four months and then began to pay with company and personal checks. McLaine would meet Hughes in parking lots and diners to make the payments. In the Acker Associates books, McLaine would label the expenses as consulting work. For every month from January 2005 to November 2007 (when Cordaro lost reelection), Acker Associates paid $10,000 to Hughes to forward to Cordaro, including one $15,000 payment because McLaine "had gotten another . . . contract[]." J.A. 626 (Hughes).

B.

Highland Associates is an architectural-engineering firm whose principals are Domenic Provini, Kevin Smith, and Don Kalina.

In January 2004, as Al Hughes had requested, McLaine called Domenic Provini about making monthly payments to Cordaro. They met, and McLaine told Provini the same thing that Hughes said to him: "[i]f Highland would give Al [Hughes] $10,000 to Bob [Cordaro] they would be able to keep all their work also." J.A. 532 (McLaine). Provini notified his

6

partners about this "cash contributions for work" arrangement. J.A. 714 (Kalina). At that time, they decided they did not want to participate. Highland Associates nevertheless received new county contracts that spring to work on a courthouse, a public safety center, an intermodal center (an epicenter for bus, cab, and railroad transportation), and a stadium in Lackawanna County.

In April 2005, however, Munchak invited Don Kalina to lunch and said, "[w]ell, you know, you talked to P.J. McLaine and we need some cash." J.A. 715 (Kalina). At that point, Highland Associates had nearly $1.4 million in outstanding accounts receivable with Lackawanna County, so Kalina and his partners felt compelled to comply. They pooled $10,000 apiece, and Kalina paid it to Munchak. Cordaro called Kalina and thanked him for the contribution that afternoon or the next morning.

In June 2005, Munchak called Kalina again with the message that "we need some more cash." J.A. 722 (Kalina). The county still owed Highland Associates $1.3 million, so Kalina and his partners still felt that they had to pay. Again they gave $30,000 to Munchak.

In July or early August 2005, Cordaro met with James Finan, then the chairman of the board of directors of the County of Lackawanna Transit System (COLTS) and also the county's director of transportation. COLTS is a separate legal authority from the county, with a five-person board of directors. Board members are appointed by the county commissioners. Finan testified that Cordaro asked him to get ahold of "the architects on the center COLTS was building" — the intermodal center — "and ask[] them to step aside and go forward with just

7

Highland Associates." J.A. 791. Finan did. He contacted one of those architects and asked if they "would mind stepping aside from this project," explaining that COLTS "wanted to go forward with just one architect and that being Highland." J.A. 792 (Finan). Finan followed that conversation up with a letter, dated August 5, 2005, which memorialized that COLTS was "terminating [its] contract . . . for any further services regarding the intermodal center" because it had "decided to go forward with the project with only one architectural and engineering firm, Highland Associates." J.A. 792. The letter called this decision a "monetary and common sense issue." J.A. 792. Finan testified that he "was asked to contact them and ask[] them to step aside by Mr. Cordaro." J.A. 793.

Cordaro was then "prominent in the negotiation" of COLTS's contract with Highland Associates during August 2005. J.A. 794 (Finan). In October 2005, the COLTS board approved that contract. Two of the three voting board members, including Finan, had been appointed by Cordaro. Although federal law required it to solicit at least three proposals and conduct a bidding process, the COLTS board considered only Highland Associates' prospective contract.

In November 2005, Munchak again came calling on Highland Associates for cash. Again the partners agreed to pay. Having just received the COLTS contract, they "were afraid that the contract would be stopped" if they did not pay since there are "many, many areas in standard . . . contracts that allow the owner to stop work." J.A. 732 (Kalina). In late November or early December 2005, Cordaro was in the Highland Associates offices for a meeting, and Kalina gave

8

him an envelope with $30,000 cash.  Cordaro "put it in his jacket and he said, [t]hank you very much." J.A. 727 (Kalina).

C.

Cordaro was indicted in the Middle District of Pennsylvania in 2010.  The counts relevant here are bribery in violation of 18 U.S.C. § 666(a)(1)(B); Hobbs Act extortion in violation of 18 U.S.C. § 1951(a); and racketeering in violation of 18 U.S.C. § 1962(c) and (d).

Cordaro's trial took place in June 2011.  At the end, the court instructed the jury that

- Bribery requires that Cordaro "acted corruptly with the intent to be influenced or rewarded in connection with official actions taken or intended to be taken by the defendant in his capacity as county commissioner of Lackawanna County." J.A. 979.

- Hobbs Act extortion requires that Cordaro took property knowingly and willfully by extortion "under color of official right," which "means that the public official induced, obtained, accepted or agreed to accept a payment to which he or she was not entitled knowing that the payment was made in return for taking or withholding or influencing official acts." J.A. 985.

9

- "The term official act includes any act within the range of official duty of a public official and any decision, recommendation or action on any question, matter, cause, suit, proceeding or controversy which at any time may be pending or which may by law be brought before any public official in such public official's capacity.

  Official acts include the decisions or actions generally expected of the public official. . . . [I]n addition, official action includes the exercise of both formal and official influence and informal official influence. Official action also includes a public official's altering his or her official acts, changing the position which he or she would otherwise have taken or taking actions in his or her official capacity that he or she would not have taken but for the scheme."

J.A. 962. Cordaro was convicted of bribery, extortion, racketeering, and other crimes. He was sentenced to 132 months of imprisonment, restitution, and three years of supervised release.

D.

Cordaro appealed his conviction and sentence. This Court affirmed all but his restitution amounts. United States v. Munchak, 527 F. App'x 191 (3d Cir. 2013).

In November 2013, Cordaro moved in the trial court to vacate his sentence under 28 U.S.C. § 2255, arguing ineffective assistance of counsel. The court held an evidentiary hearing and in August 2015 denied his motion, declining to issue a certificate of appealability. Cordaro then sought a certificate of appealability from this Court, which we denied in April 2016.

After the Supreme Court issued its decision in McDonnell v. United States, Cordaro applied to this Court for authorization to file a successive habeas motion under 28 U.S.C. § 2255. We denied that application, explaining that "Cordaro's reliance on the Supreme Court's decision in McDonnell v. United States, 136 S. Ct. 2355 (2016), is misplaced, as it did not announce a new rule of constitutional law, but rather clarified the meaning of what constitutes an 'official act' under the federal bribery statute, 18 U.S.C. § 201." In re Cordaro, No. 16-4156 (3d Cir. Dec. 22, 2016) (order denying application). We did, however, "note that we have not considered whether claims like Cordaro's would be viable in a 28 U.S.C. § 2241 petition." Id.

Cordaro then filed the habeas petition before us under 28 U.S.C. § 2241. After oral argument, but without an evidentiary hearing, the Magistrate Judge determined that the § 2241 petition was proper because "there is a chance that Cordaro is incarcerated for conduct that does not constitute a crime" and "he has had no earlier opportunity to test the legality of his detention," but recommended that the District Court deny Cordaro's petition on the merits because he failed to establish that he was actually innocent — that is, that it is more likely than not that no reasonable juror would have convicted him if properly instructed under McDonnell.

11

J.A. 46, 52–60. Over Cordaro's objections, the District Court adopted the Magistrate Judge's recommendation and denied his petition.

Cordaro timely appealed.

II.

The Supreme Court has held that collateral relief from a federal criminal conviction is available under 28 U.S.C. § 2255 based on an intervening interpretation of a substantive criminal statute. Davis v. United States, 417 U.S. 333, 346–47 (1974). But an intervening statutory interpretation does not authorize a successive § 2255 motion under 28 U.S.C. § 2255(h). In re Dorsainvil, 119 F.3d 245, 247–48 (3d Cir. 1997). This creates a problem for a petitioner in the "unusual circumstance" when an intervening statutory interpretation that may render a petitioner's conduct noncriminal comes only after his first § 2255 motion. Id. at 251. So, we have held that a petitioner in that "uncommon situation may resort to the writ of habeas corpus codified under 28 U.S.C. § 2241," id. at 248, because the remedy provided by § 2255 is "'inadequate or ineffective to test the legality of [his] detention'" within the meaning of the saving clause of § 2255(e), id. at 249 (quoting 28 U.S.C. § 2255(e)).

Two conditions must be satisfied to proceed under § 2241. "First, a prisoner must assert a 'claim of "actual innocence" on the theory that "he is being detained for conduct that has subsequently been rendered non-criminal by an intervening Supreme Court decision" and our own precedent construing an intervening Supreme Court decision'" — that is, when there has been "a change in statutory caselaw that applies

12

retroactively in cases on collateral review." Bruce v. Warden Lewisburg USP, 868 F.3d 170, 180 (3d Cir. 2017) (quoting United States v. Tyler, 732 F.3d 241, 246 (3d Cir. 2013)). "And second, the prisoner must be 'otherwise barred from challenging the legality of the conviction under § 2255.'" Id. (quoting Tyler, 732 F.3d at 246). "Stated differently, the prisoner has 'had no earlier opportunity to challenge his conviction for a crime that an intervening change in substantive law may negate.'" Id. (quoting Dorsainvil, 119 F.3d at 252). Invoking the district court's jurisdiction requires only that the record supports "at least a sufficiently colorable claim" that these conditions are met. Dorsainvil, 119 F.3d at 252.

Here, the District Court properly exercised jurisdiction under § 2241.[2] First, Cordaro asserted a colorable claim of actual innocence on the theory that he is being detained for conduct that was subsequently rendered noncriminal by the

---

[2] We follow Bruce in considering this inquiry to be jurisdictional, which no party has disputed, but note that our Court has not analyzed whether § 2255(e) is jurisdictional under the Supreme Court's decision in Arbaugh v. Y & H Corp., 546 U.S. 500 (2006), and its progeny. Our sister Courts of Appeals that have applied Arbaugh and its progeny to § 2255(e) have concluded that it is jurisdictional. See United States v. Wheeler, 886 F.3d 415, 422–26 (4th Cir. 2018); Williams v. Warden, 713 F.3d 1332, 1340 (11th Cir. 2013). Only the Seventh Circuit Court of Appeals has held that § 2255(e) is not jurisdictional, in a decision that preceded Arbaugh. See Harris v. Warden, 425 F.3d 386, 388 (7th Cir. 2005).

13

Supreme Court's decision in <u>McDonnell</u>.[3] Second, Cordaro had no earlier opportunity to challenge his conviction under <u>McDonnell</u> because we denied him a certificate of appealability on his first § 2255 motion in April 2016 and <u>McDonnell</u> was not decided until June 2016.

Once satisfied it has jurisdiction over a habeas petition under § 2241, a district court provides the petitioner "with an opportunity to demonstrate his actual innocence." <u>Tyler</u>, 732 F.3d at 253; <u>see also</u> <u>id.</u> at 246–47, 252–53. The court can hold

---

[3] At oral argument, the Government conceded that <u>McDonnell</u> applies retroactively in cases on collateral review, as it has elsewhere, <u>see, e.g.</u>, <u>United States v. Ciavarella</u>, No. 3:09-CR-272, 2018 WL 317974, at *9 n.6 (M.D. Pa. Jan. 8, 2018) ("The government does not dispute . . . that <u>McDonnell</u> is retroactively applicable to cases on collateral review."), <u>aff'd</u>, 765 F. App'x 855 (3d Cir. 2019). That concession is not without a legal basis. Under <u>Teague v. Lane</u>, 489 U.S. 288 (1989), new substantive rules apply retroactively in cases on collateral review. <u>See</u> <u>Bruce</u>, 868 F.3d at 181. A "rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." <u>Schriro v. Summerlin</u>, 542 U.S. 348, 353 (2004). "This includes decisions that narrow the scope of a criminal statute by interpreting its terms . . . ." <u>Id.</u> at 351–52. And "a case announces a new rule if the result was not <u>dictated</u> by precedent existing at the time the defendant's conviction became final." <u>Teague</u>, 489 U.S. at 301. A "holding is not so dictated . . . unless it would have been 'apparent to all reasonable jurists.'" <u>Chaidez v. United States</u>, 568 U.S. 342, 347 (2013) (quoting <u>Lambrix v. Singletary</u>, 520 U.S. 518, 527–28 (1997)). <u>McDonnell</u> arguably satisfies these requirements.

14

an evidentiary hearing, at which the petitioner may introduce new evidence and the Government may present additional evidence to refute the petitioner's claim. Id. at 253. Or the petitioner may rest on the record as it stands. Id.

While the "Supreme Court has yet to decide whether a prisoner can obtain habeas relief based on a freestanding claim of actual innocence, . . . 'the threshold showing for such an assumed right would necessarily be extraordinarily high.'" Bruce, 868 F.3d at 183 (quoting Herrera v. Collins, 506 U.S. 390, 417 (1993)). Our Court's precedents instruct "that actual innocence claims under § 2241 are to be initially tested against the . . . actual innocence gateway standard" by which a habeas petitioner may overcome a procedural default even without cause and prejudice. Id. at 184 (employing the standard set forth in Schlup v. Delo, 513 U.S. 298, 314–15 (1995)); see also House v. Bell, 547 U.S. 518, 555 (2006) (noting that a freestanding actual-innocence claim would require "more convincing proof of innocence" than does the gateway standard). When actual innocence relies on an intervening interpretation of substantive criminal law, the actual-innocence gateway standard requires a petitioner to show that, in light of all the evidence, it is more likely than not that no reasonable juror properly instructed on the intervening interpretation would have convicted him. See Bruce, 868 F.3d at 184; see also Tyler, 732 F.3d at 246. We have observed that the "[f]ailure to meet the gateway standard is sufficient to reject any hypothetical freestanding actual innocence claim." Bruce, 868 F.3d at 184.

The District Court held that Cordaro failed to satisfy the actual-innocence gateway standard. It reasoned that Cordaro did not show that it was more likely than not that no reasonable

juror properly instructed on the meaning of "official act" under McDonnell would have voted to convict him. Thus, it denied his petition.

We have jurisdiction over the District Court's final order denying Cordaro's petition under 28 U.S.C. §§ 1291 and 2253(a). Since the District Court did not hold an evidentiary hearing, our review is plenary. Bruce, 868 F.3d at 183.

III.

A.

In McDonnell, the Supreme Court vacated the convictions of former Virginia Governor Robert McDonnell for allegedly accepting bribes from a nutritional-supplement company to commit certain "official acts": arranging meetings, hosting events, contacting other government officials, promoting the company's product and facilitating its relationship with government officials, and recommending that senior government officials meet with its executives. 136 S. Ct. at 2365–66. The Court held that "setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" Id. at 2368. Instead, an "official act" has two statutory requirements. First, there must be a "matter" — that is, "a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official" — and second, "the public official must make a decision or take an action on that question or matter, or agree to do so." Id. at 2368, 2370.

16

We consider whether it is more likely than not that no reasonable juror would have convicted Cordaro of bribery, extortion, and racketeering if properly instructed on this definition.[4] The answer is no.

[4] Neither party questions whether the Supreme Court's interpretation of 18 U.S.C. § 201's definition of "official acts" in McDonnell applies to Cordaro's Hobbs Act extortion and racketeering convictions. Instead "they each apply the 'official act' definition from McDonnell in support of their arguments on appeal," and neither side "argues for an alternative definition." United States v. Silver, 864 F.3d 102, 116 n.67 (2d Cir. 2017). We therefore assume that the interpretation in McDonnell applies, even though the Court was interpreting a different statute than the one that Cordaro was convicted of violating and, unlike in that case, there is no evidence here that the parties agreed at trial to rely on 18 U.S.C. § 201's definition.

The parties do disagree whether McDonnell applies to Cordaro's conviction for bribery in violation of 18 U.S.C. § 666. As relevant here, § 666 criminalizes agreeing to accept anything of value "intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency." Id. § 666(a)(1)(B). The trial court instructed the jury, however, that this crime requires "the intent to be influenced or rewarded in connection with official actions." J.A. 979. Because the court said "official actions," Cordaro argues that McDonnell applies. The Government responds that, if anything, the instruction narrowed § 666 and points out that the Courts of Appeals for the Second and Eighth Circuits have held that McDonnell does not apply to § 666. Since we conclude that

17

First, there is evidence of a "matter":  contracts with Lackawanna County.  Both Acker Associates and Highland Associates were repeat county contractors.  Acker Associates had contracts to work on the Lackawanna Watershed 2000 Program, the Main Street Bridge in Taylor, the Gilmartin Street Bridge in Archbald, and more.  Highland Associates had contracts to work on the courthouse, the public safety center, the intermodal center, and the stadium.

Entering into contracts is "a formal exercise of governmental power" that falls "within the specific duties of an official's position."  McDonnell, 136 S. Ct. at 2369.  Contracts are negotiated, performed, and concluded or terminated.  It is easy to imagine any of those steps being "put on an agenda, tracked for progress, and then checked off as complete."  Id.  And they are "focused and concrete" — Lackawanna County does not contract for something amorphous like "[e]conomic development," for example, id., but for specific projects or services, such as "building a wastewater treatment plant for acid mine drainage," J.A. 521 (McLaine).  Contracts are therefore like a lawsuit or administrative proceeding and unlike "a typical meeting, telephone call, or event arranged by a public official."  McDonnell, 136 S. Ct. at 2368.  Indeed, as we have explained, "[t]he awarding of a [government] contract is not only akin to an agency determination — it is an agency determination."  United States v. Repak, 852 F.3d 230, 253 (3d Cir. 2017).  It is

Cordaro fails to prove his actual innocence even under McDonnell's definition of "official acts," we need not resolve whether McDonnell in fact applies to § 666.

18

probable that some reasonable juror would conclude that the county contracts constituted "matters" under McDonnell.

Second, it is probable that some reasonable juror would conclude that Cordaro agreed to or did act on those matters.

Considering first Acker Associates, there is evidence that Cordaro acted on its contracts directly. When McLaine was worried about losing the Taylor Bridge contract, he met with Cordaro, who told him that he could keep the full contract and to call the other engineers and tell them so. McLaine did and kept the contract.[5]

This is also evidence that Cordaro agreed to act on Acker Associates' contracts. At their first meeting, Cordaro told McLaine that he would "let [Acker Associates] keep that [existing work]," but "if we're having fundraisers you're going to have to participate and support us." J.A. 526 (McLaine). And when McLaine was worried about losing the watershed-project contract, Cordaro asked Hughes whether McLaine would pay "to keep his work." J.A. 621 (Hughes). Hughes then told McLaine that Acker Associates could keep all of its existing work if McLaine gave Hughes $10,000 a month for Cordaro. The Court in McDonnell emphasized that "a public official is not required to actually make a decision or take an action" on the matter; "it is enough that the official agree to do so." 136 S. Ct. at 2370–71. "The agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain. Nor must the public official in fact intend to perform the 'official act,' so

---

[5] And McLaine paid Cordaro extra at least once because he "had gotten another . . . contract[]." J.A. 626 (Hughes).

19

long as he agrees to do so." Id. at 2371. It is probable that some reasonable juror would conclude from this evidence that Cordaro made such an agreement.

For Highland Associates, the evidence too shows direct action. Cordaro was prominent in the negotiation of Highland Associates' contract with COLTS after he told COLTS chairman James Finan to ask the other architects working on the intermodal center to step aside so COLTS could go forward with just Highland Associates. It is probable that some reasonable juror would conclude from this evidence that Cordaro "was attempting to pressure or advise another official on a pending matter." Id. Both actions qualify under McDonnell, as does "a decision or action on a qualifying step." Id. at 2370.

There are also the payments themselves: monthly $10,000 payments from Acker Associates and three $30,000 payments from Highland Associates (nearly half a million dollars in total). The Court explained in McDonnell that a jury could "conclude that an agreement was reached if the evidence shows that the public official received a thing of value knowing that it was given with the expectation that the official would perform an 'official act' in return." Id. at 2371. It is probable that some reasonable juror would conclude that had occurred here.

Taking this evidence together, would some reasonable juror conclude that Cordaro committed official acts as defined by McDonnell? The answer is yes. And Cordaro must show that it is more likely than not that no reasonable juror would reach that conclusion. He fails to do so and thus fails to prove his actual innocence.

B.

Cordaro challenges this conclusion in three ways. First, he points out that the engineering firms actually contracted with independent governmental agencies, not the county itself. Second, he identifies new evidence impeaching key Government witnesses. And third, he highlights trial evidence of routine meetings that do not constitute official acts. None of these facts change our conclusion.

1.

First, Cordaro argues that the governmental agencies that contracted with Acker Associates and Highland Associates are independent legal authorities distinct from Lackawanna County itself.

This fact does not affect whether the contracts are a "matter" under McDonnell. In McDonnell itself, the primary "matter" was whether researchers at Virginia's state universities would study a nutritional supplement. See 136 S. Ct. at 2369–70. State universities are independent legal authorities, and McDonnell had "limited decision-making power in this area." 136 S. Ct. at 2363. None of that mattered to the Supreme Court. On the contrary, the Court specifically explained that it "would be illegal" to agree to "pressure or advise another official on a pending matter . . . in exchange for a thing of value." Id. at 2371.

Nor does this fact affect whether Cordaro made a decision or took an action on those contracts or "agree[d] to do so." Id. Maybe Cordaro did not mean it when he said that he

21

would "let [Acker Associates] keep that [existing work]" because he lacked the authority to do so. J.A. 526 (McLaine). But under McDonnell that does not matter, "so long as he agrees to do so." 136 S. Ct. at 2371.

There is also evidence that in fact Cordaro was able and intended to influence whether Acker Associates and Highland Associates retained their contracts. Cordaro himself said that he could: he told McLaine as much at their first meeting. And the principals of these firms — experienced county contractors — certainly thought he could. McLaine was worried about Acker Associates' work right after the election, and both firms paid Cordaro tens of thousands of dollars. That Cordaro solicited those payments (through Hughes and Munchak) and accepted them (through Hughes and Munchak and on his own) suggests that he could and intended to exert some influence in return. See, e.g., Repak, 852 F.3d at 254 ("[The defendant's] continued receipt of items from those contractors further demonstrated that he intended for such items . . . to influence the award of [government] contracts to those contractors.").

There is even evidence that Cordaro did influence contracts with county agencies. Cordaro influenced the Taylor Bridge contract, keeping the design work with Acker Associates, and he influenced the COLTS contract, having another architectural firm's existing contract terminated — precisely the risk that Acker Associates and Highland Associates paid dearly to avoid.

In sum, whatever the chain of technical legal authority in Lackawanna County, there is ample evidence that Cordaro agreed to, could, and did influence who kept and lost contracts with county entities. Again, it is probable — and indeed quite

22

likely — that some reasonable juror would conclude that Cordaro agreed to exert that influence for cash.

In that regard, this case is much like United States v. Repak. Repak was the executive director of a municipal agency governed by a board of directors. 852 F.3d at 237. Like Cordaro, Repak himself did not authorize the contracts at issue; the board of directors did. Id. Repak, however, made recommendations and played "a vital role in the process of selecting" contractors. Id. Challenging his bribery and extortion convictions on direct appeal, Repak argued that "the facilitation of the award of those contracts is not a decision or action 'on' a question or matter" under McDonnell. Id. at 254. We rejected that argument. On the contrary, we explained, the record proved that "Repak had the power to, and indeed did, make recommendations . . . as to the contractors [that the agency] hired for projects." Id. This "evidence was sufficient for the jury to conclude that he accepted the [gifts] knowing that he was to use his power, i.e., the ability to provide advice, to influence the [agency's] awarding of contracts." Id. Similarly here, the record shows that Cordaro had the power to, and indeed did, influence contracts with county agencies. Based on this evidence, it is probable that some reasonable juror would conclude that Cordaro committed official acts.

Our Repak decision also belies the argument that there was no matter "pending" for Cordaro to influence because the contracts already existed. Repak solicited items from contractors who already had municipal contracts, and those contractors acquiesced in Repak's solicitations because they felt that they would lose work if they did not. Id. at 237. Cordaro engaged in the same conduct.

23

Cordaro argues that Repak actually favors him because, unlike the defendant there, he "was not the executive in charge of the contract-awarding entity." Cordaro Br. 30. We are not persuaded. Contrary to Cordaro's arguments, Repak was not "in charge," nor did he have "the ability to award contracts." Id. Rather, it was the board of directors that "ultimately confer[red] contracts." Repak, 852 F.3d at 237. The only distinction between Repak and Cordaro, then, is that Repak worked inside the contracting governmental agency, while Cordaro did not. Nothing in our Repak opinion suggests that makes a difference. Cordaro, like Repak, still had the "power . . . to influence the [agency's] awarding of contracts" because of his position. Id. at 254. Even if Cordaro's official role was more removed from the decisionmaking, unlike Repak he was superior to the decisionmakers — as county commissioner, he appointed the board members, including both board members who approved Highland Associates' COLTS contract.

Thus, this argument does not disturb our conclusion that it is probable that some reasonable juror would vote to convict Cordaro under McDonnell.

2.

Second, Cordaro argues that new impeachment evidence discredits Hughes and McLaine. After trial, both men were indicted for fraud, and McLaine was convicted. The parties disagree whether we can consider this evidence, but their disagreement is immaterial since this evidence does not disturb our conclusion. To begin, this evidence hardly bears on the issues raised by McDonnell. A jury properly or improperly instructed on "official acts" would assess the credibility of Hughes and McLaine just the same.

24

But regardless, this new impeachment evidence seems unlikely to matter to a reasonable juror's vote. It was clear at trial that McLaine and Hughes were corrupt. McLaine bribed Cordaro, Hughes helped, and then McLaine labeled Hughes a "consultant" in the books and covered his tax liability out of pocket. The trial jury still found them credible enough to convict Cordaro. Would no properly instructed and reasonable juror reach that conclusion knowing McLaine and Hughes were later indicted (and McLaine convicted) for other fraud offenses? That does not seem more likely than not — in fact it does not seem likely at all. So we do not find this argument persuasive.

3.

Third, Cordaro argues that the erroneous jury instructions allowed the jury to convict him for routine meetings with Acker Associates and Highland Associates that were noncriminal under McDonnell. If this were a direct appeal of erroneous (and contemporaneously objected to) jury instructions, we would ask whether it is clear beyond a reasonable doubt that a rational jury properly instructed would have found Cordaro guilty. See, e.g., United States v. Fattah, 914 F.3d 112, 155 (3d Cir. 2019); United States v. Silver, 864 F.3d 102, 119 (2d Cir. 2017). And if we concluded that "the jury may have convicted [Cordaro] for conduct that is not unlawful," we would be unable to "conclude that the error in the jury instruction was harmless beyond a reasonable doubt," and we would "vacate and remand the convictions." Fattah, 914 F.3d at 155.

But this is not a direct appeal. We are not presented with whether the jury may have convicted Cordaro for conduct

25

noncriminal under <u>McDonnell</u>. We are not concerned with what the misinformed jury did, might have done, or could have done. Instead, we are making a "probabilistic determination about what reasonable, properly instructed jurors would do." <u>Schlup</u>, 513 U.S. at 329. And, making that determination, we cannot conclude that "no juror, acting reasonably, would have voted to find [Cordaro] guilty beyond a reasonable doubt." <u>Id.</u>

IV.

For these reasons, we will affirm the judgment of the District Court.

26